**In re Daniel C. & Nancy E. FEENSTRA, Debtors.**

**Daniel C. & Nancy E. FEENSTRA, Plaintiffs,**

**v.**

**NEW YORK STATE HIGHER EDUCATION SERVICES CORPORATION, Defendant.**

**Bankruptcy Nos. 83–21431, 84–2121A.**

United States Bankruptcy Court, W.D. New York.

July 12, 1985.

---

Michael J. Kieffer, Rochester, N.Y., for plaintiffs.

Frederick J. Schreyer, N.Y.S. Higher Education Services Corp., Albany, N.Y., for defendant.

## MEMORANDUM AND DECISION

EDWARD D. HAYES, Bankruptcy Judge.

The debtors filed a complaint to have an educational loan debt declared dischargeable as an undue hardship under 11 U.S.C. § 523(a)(8)(B). The New York State Higher Education Services Corporation (NYSHESC) answered that repayment of the educational loan would not be an undue hardship. The hearing was held and submitted for decision.

The facts are as follows. The debtors filed a joint Chapter 7 petition in bankruptcy on December 30, 1983. The petition listed total debts of $67,184.30: priority taxes of $103.67; secured debts of $54,-513.87; and unsecured debts of $12,566.57. The debtors received their discharge on April 18, 1984 and the case was closed on June 14, 1984. On July 16, 1984, the Court granted the debtors' ex-parte motion to re-open the case in order to permit the debtors to commence an adversary proceeding to determine the dischargeability of an educational loan. The debtors filed their complaint on November 5, 1984 requesting that the Court declare the educational loan dischargeable because of undue hardship.

The educational loan in this case was obtained by Mr. Feenstra, from Monroe Savings Bank's parent loan division. Only Mr. Feenstra, the debtor, signed the note. The debtor's son, the student, never signed the note.[1] The proceeds of the loan were paid directly to the University of Rochester for Mr. Feenstra's son's freshman year of college. Payments on the loan were made by Mr. Feenstra up until the time the bankruptcy was filed. The NYSHESC had guaranteed this educational loan and upon the debtors' default, purchased the loan from Monroe Savings Bank on March 30, 1984. The parties have stipulated that the amount owing on the loan is $2,604.96.

Mr. Feenstra, the debtor, is forty-nine years old and has five dependents; a wife and four children. All four children cur-

---

**1.** NYSHESC offered no evidence that Mrs. Feenstra had ever signed the note, therefore, during the trial the Court dismissed the dischargeability action as against Mrs. Feenstra.

rently live at home and depend upon their parents for support. Mr. Feenstra, and all four of his children, who range in age from 15 to 21, are recovering alcoholics and drug addicts. From October 1982 through July 1983, the entire family was in and out of the Fountain Lake Treatment Center in Minnesota. Although she did not suffer from an addiction, Mrs. Feenstra ended up in the treatment program as a co-dependent. Her nerves were so bad from caring for and dealing with her family's addictions that she needed treatment as well. Mrs. Feenstra describes herself as an "emotional basket case." She says she is not capable of obtaining or maintaining employment and has no plan to work in the immediate future.

Mr. Feenstra suffers from chronic glomerulonephritis, a kidney disease which produces high blood pressure, fatigue, and gout. Because of the build up of uric acid in his body and the inflammation of his skin and feet, Mr. Feenstra was not able to work twenty days during the six month period preceding this trial. Mr. Feenstra used to work overtime. However, the fatigue and gout now make working long hours and earning extra money impossible. Visits to doctors, payments for medications, and prescription drugs for five people add to Mr. Feenstra's normal living expenses. Additionally, the Feenstras have incurred $800 in post-petition medical bills. Mr. Feenstra's condition can currently be described as stable, the possibility of dialysis or a kidney transplant may be in his not too distant future.

Despite his disease, Mr. Feenstra has been able to work most of the time. He has a job mixing chemicals at the Olin Corporation. His job requires a lot of leg work and climbing of stairs. Using a two-wheel hand truck, Mr. Feenstra moves fifty-five gallon drums weighing between five and six hundred pounds around the manufacturing area of the plant. This type of physical work will probably become impossible if his disease progresses. Currently,

Mr. Feenstra is able to earn an average take home pay of $1,664.10 a month including an annual bonus.

The family's monthly expenses are as follows: [2] mortgage payments $591.82; utilities (electric, water, telephone) $164.00; garbage collection $11.33; food $500.00; clothing $15; insurance (life, fire, auto) $91; medical bills $84; home repair and auto maintenance $15; gasoline $100; and car payment $72. These expenses total $1,644.15.

At trial, the debtor argued that 11 U.S.C. § 523(a)(8) should not apply to this loan, because a loan to a parent-debtor was not the type of loan Congress intended to except from discharge when it enacted 11 U.S.C. § 523(a)(8). Alternatively, the debtor contends that if 11 U.S.C. § 523(a)(8) does apply to this parent loan, the debt should be discharged because it imposes an undue hardship on the debtor and his dependents. The NYSHESC first contends that the loan is a government guaranteed educational loan which clearly falls within the meaning of 11 U.S.C. § 523(a)(8) and second, contends that the repayment of the debt will not impose an undue hardship on the debtor and his dependents and that the loan should not be discharged.

The first question presented is whether a government guaranteed educational loan made to a student's parent, where the student does not sign the loan note, and where the parent becomes a debtor in bankruptcy is the type of loan which can be excepted from discharge pursuant to 11 U.S.C. § 523(a)(8).

The second question presented is if 11 U.S.C. § 523(a)(8) does apply, will the repayment of this loan impose an undue hardship on the debtors and their dependents pursuant to 11 U.S.C. § 523(a)(8)(B).

11 U.S.C. § 523(a)(8)(B) reads as follows: (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

---

**2.** The figures for the expenses were obtained from a combination of the testimony at the trial

and the debtors' answers to NYSHESC's interrogatories.

(8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or a non-profit institution of higher education, unless—

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;

The debtors, as parents and obligors on the loan note, contend that the § 523(a)(8) exception to discharge applies only to educational loans made to student-debtors. The debtors claim that the legislative history [3] indicates that § 523(a)(8) was only intended to prevent students with little or no assets from discharging their educational loans after having received the benefit of their education, while having the prospect of a prosperous career ahead of them.

The United States Supreme Court has said that the literal terms of a statute are to be overridden only under rare and exceptional circumstances. *Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156, 175 (1930). "We give to the words their natural significance unless that leads to an unreasonable result plainly at variance with the evident purpose of the legislation" (citations omitted). *Lincoln v. Ricketts*, 297 U.S. 373, 376, 56 S.Ct. 507, 509, 80 L.Ed. 724, 727 (1936).

The fact that parental educational loan programs may not have existed at the time the statute was enacted does not prevent the statute from applying to them at this time.

[I]t is a general rule of statutory construction that, in the absence of a contrary indication, legislative enactments which are prospective in operation and which are couched in general and comprehensive terms broad enough to include unknown things that might spring into existence in the future, even though they are words of the present tense, apply alike to new situations, cases, conditions, things, subjects, methods, inventions, or persons or entities coming into existence subsequent to their passage, where such situations, cases, conditions, things, subjects, methods, inventions, persons, or entities are of the same class as those specified, and can reasonably be said to come within the general purview, scope, purpose, and policy of the statute, and the evident meaning of the terms used.

(citations omitted) § 205 Statutes, 73 Am. Jur.2d at 400.

The policy behind § 523(a)(8) was to give all educational loans, special treatment in bankruptcy. Namely, they were excepted from discharge. If § 523(a)(8) were found not to apply to educational loans obtained by parents, thereby allowing parental educational loans to be discharged in bankruptcy, it would not be inconceivable that before long many students would have their parents obtain their educational loans, and have their parents file bankruptcy shortly thereafter. Such an interpretation of the statute would create a legal loophole for discharging educational loans when obtained by a student's parent. It is also conceivable that the banks would soon require students to co-sign the educational loan notes. With the student as co-signer, § 523(a)(8) would definitely apply, at least as to the student-debtor.[4] Even if the parental educational loan program was enacted after § 523(a)(8) was written into law,

---

**3.** See for example: H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 132–162 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787; 124 Cong.Rec. H 466–472 (daily ed. February 1, 1978); S.Rep. No. 95–989, 95th Cong.2d Sess. 79 (1978); 124 Cong. Rec. H 11096 (daily ed. Sept. 28, 1978); 124 Cong.Rec. S 17412 (daily ed. October 6, 1978).

**4.** See *In re Boylen*, 29 B.R. 924, 10 B.C.D. 874 (Bankr.N.D. Ohio 1983) and *In re Washington*, 41 B.R. 211, CCH ¶ 69,926 (Bankr.E.D.Va.1984). Those cases held that § 523(a)(8) did not apply

to a co-maker who was not the student. The case at bar, however, is not a co-maker case because the student never signed the note. Although the co-maker cases discharged the nonstudent co-maker, the legislative intent behind § 523(a)(8) was frustrated because someone, namely the student, remained liable for the educational loan. Therefore, even if the student subsequently filed bankruptcy, the educational loan would not be excepted from discharge.

the statute is broad enough to cover the parental educational loan and the application of § 523(a)(8) to the parental loan program appears to be within the Congressional policy of excepting guaranteed educational loans from discharge in bankruptcy.

The debtor claims, that excepting the parental educational loan from discharge was not intended by Congress. By applying the literal terms of the statute, however, it cannot be said that excepting the parental loan would lead to a result plainly at variance with the purpose of the legislation. Although the filing of bankruptcy by students whose sole intent was to discharge an educational loan may have been the incentive for Congress' enacting the educational loan exception to discharge, the enacted statute went much further than just excepting from discharge the abusive student's educational loans. Every guaranteed educational loan was excepted from discharge. The only exceptions were those due more than five years and those which would produce an undue hardship. So even though the abusive filing may have been what spurred Congress' action, the statute itself gave all guaranteed educational loans special treatment in bankruptcy.

The Supreme Court has said:

Courts have sometimes exercised a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which literally they did not bear in order to escape consequences thought to be absurd or to entail great hardship. But an application of the principle so nearly approaches the boundary between the exercise of the judicial power and that of the legislative power as to call rather for great caution and circumspection in order to avoid usurpation of the latter. It is not enough merely that hard and objectionable or absurd consequences, which probably were not within the contemplation of the framers, are produced by an act of legislation. Laws enacted with good intention, when put to the test, frequently, and to the surprise of the lawmaker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts. (citations omitted) *Crooks v. Harrelson,* 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156, 175.

11 U.S.C. § 523(a)(8) is clear and unambiguous on its face. Section 523(a)(8) speaks of an educational loan guaranteed by a governmental unit. There is no question in this case that the loan to Mr. Feenstra was used solely for his son's education and that the loan was guaranteed by NYSHESC. This loan clearly falls within the literal terms of the statute which the Supreme Court said should only be overridden in rare and exceptional circumstances. One other Court faced with this problem reached the same conclusion, although its reasoning was not explicitly stated. See *In re Reid,* 39 B.R. 24 (Bankr.E.D.Tenn.1984). Therefore, until the legislature or a higher Court says otherwise, § 523(a)(8) excepts from discharge, an educational loan guaranteed by a governmental unit or non-profit institution regardless of whether the loan is made directly to the student or to the student's parent.

■ Having found that § 523(a)(8) does apply to the case at bar, the next question which must be answered is whether the debt should be discharged for undue hardship.

In *In re Ford,* 22 B.R. 442, 9 B.C.D. 715 (Bankr.W.D.N.Y.1982) this Court set forth the legislative history, case law definitions, and tests regarding the determination of undue hardship in educational loan discharge cases. This opinion will apply those principles and tests to the facts in the case at bar.[5]

Courts have applied three tests to determine whether the facts of a particular case

---

5. For a detailed analysis of the undue hardship question see *In re Ford* and the cases cited therein.

constitute undue hardship. The three tests are:

(i) the mechanical "undue hardship" test (focusing on debtor's expenses and future financial resources); (ii) the good faith test (factors include debtor's efforts to obtain employment, minimize expenditures, and maximize resources); and (iii) the underlying policy test (amount of student loan debt, percentage of indebtedness, and benefit from education). *In re Clay*, 12 B.R. 251, 254 (Bankr.N.D.Iowa 1981) citing *In re Johnson*, 5 B.C.D. 532, 544–45 (Bankr.E.D.Pa.1979).

The first test is the mechanical test. In *Ford*, this Court held that with a monthly net income of $1,116 and monthly expenses of $1,330, to require the debtor to pay $35.53 in monthly installments as required by the student loan agreement would impose an economic deprivation and undue hardship on the debtor. In the case at bar, the debtors' present monthly expenses are within twenty dollars of their monthly income. It must be noted here that the debtors' expenses were unrealistic in a couple of areas. The debtors listed clothing expenses of only $15 a month, $180 a year is not going to adequately clothe a family of six. Likewise, the $15 a month for home repair and auto maintenance does not seem appropriate. One auto repair will deplete the $180 the debtors have budgeted. In addition to these observations, the debtor has incurred post-petition medical bills as a result of his kidney disease, including a $750 debt to Strong Memorial Hospital. It is not likely that Mr. Feenstra's future income will be greater than his current income. In fact, given Mr. Feenstra's disease, it is very likely that his income will decrease as his disease progresses and his ability to stand on his feet and move heavy barrels declines. Also, as the disease gets worse, the medical expenses will necessarily increase. In view of the debtors' underestimated and conservative listing of their expenses, the probability of a decrease in their income and increase in their expenses if or when the disease worsens, it is obvious that the debtors' current income would not be sufficient to support the debtor and his dependents at a minimal standard of living if the repayment of the $2,604.96 plus interest educational loan obligation is added to their current monthly expenses. Ergo, the repayment of the educational loan would impose an economic deprivation and undue hardship on the debtors and their dependents. "Such deprivation is clearly contrary to the fresh start policy of the Bankruptcy Code." *In re Ford*, 22 B.R. at 446, 9 B.C.D. at 717 (Bankr.W.D.N.Y.1982).

The second test involves the debtors' good faith. As has already been pointed out, the Feenstras' expenses are reasonable, if not underestimated. They are in no way extraordinary or lavish. Mr. Feenstra's disease has caused his income to drop because he can no longer work the overtime hours which brought his family some additional income. Mr. Feenstra can do little to improve his income situation and can only hope that his health will allow him to maintain his current income for awhile. The debtors made payments on the loan up until filing bankruptcy. The Feenstras made a good faith effort to repay the student loan but given their present financial picture now find it impossible to continue payments. This adversary proceeding by the Feenstras, to have the debt declared dischargeable is not in bad faith.

The third test is the policy test. The Feenstras' $2,604.96 plus interest debt to NYSHESC is only 21% of their total $12,566.57 unsecured pre-petition debt, and only 4% of the total $67,184.30 debts listed in their bankruptcy petition. The discharge of the educational loan was obviously not the debtors' sole motivation for filing bankruptcy.

For the foregoing reasons it is decided that: 11 U.S.C. § 523(a)(8) applies to an educational loan guaranteed by a governmental unit made to the parent of a student who received the benefit of the educational loan when the parent is the sole maker of the note and the parent files bankruptcy. The application of the mechanical test indicates that the repayment of the educational

loan debt to NYSHESC would impose an economic deprivation and undue hardship on Mr. and Mrs. Feenstra and their dependents. The debtors have filed for bankruptcy in good faith and a discharge of this educational loan would not violate Congressional policy or represent an abuse of the educational financing programs. The educational loan obligation to NYSHESC is discharged, and it is so ordered.