**In re Ruth A. CONNER, Debtor.**

**Ruth A. CONNER, Plaintiff,**

**v.**

**ILLINOIS STATE SCHOLARSHIP COMMISSION, Defendant.**

**Bankruptcy No. 87 B 1113.
Adv. No. 88 A 78.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Aug. 2, 1988.

Neil F. Hartigan, Illinois Atty. Gen., Richard Nowell, Asst. Atty. Gen., Chicago, Ill., for defendant.

Gregory K. Stern, Chicago, Ill., for plaintiff/debtor.

## MEMORANDUM & OPINION

ROBERT E. GINSBERG, Bankruptcy Judge.

### FACTS

The issue before the Court is whether this Chapter 7 debtor's student loan debt should be discharged pursuant to 11 U.S.C. § 523(a)(8)(B). The Debtor is a 51 year old divorced [1] female with four children, one of whom lives at home with her full time and one of whom lives at home with her while on break from college.[2] The Debtor owes the Illinois State Scholarship Commission, ("ISSC"), approximately $36,000 in student loans which she incurred while attending the Chicago Art Institute School.[3] The Debtor hoped to teach college or high school after graduating from the Art Institute School in 1983, but lack of experience, a Ph.D. or a teaching certificate prevented her from obtaining a teaching job at either level. After an extended period of unemployment and marginal employment, the Debtor finally managed to find a satisfactory job in the private sector. The Debtor has worked at Citifax Corporation since May, 1986 and earns approximately $25,000 per year.

Notwithstanding her job at Citifax, the Debtor has had considerable difficulty paying her bills. In fact, the Debtor testified that it was because of her student loan debt [4] and lawsuits filed against her by various landlords [5] that she had to file her Chapter 7 [6] petition in 1987. At the time of filing her petition the Debtor also had numerous medical bills and a credit card bill. She testified that her prepetition debts, including her student loans, totalled approximately $65,000.

The Debtor has also been unable to keep up with the debts she has been accruing postpetition. She has been unable to pay the attorney representing her in bankruptcy. She needs new glasses and cannot afford them. She needs approximately $2,000 worth of dental work and cannot afford that either. She needs a new car. Her present 1977 Oldsmobile does not run

---

**1.** The Debtor was married to a successful dentist in California. Under the terms of their divorce the Debtor was to receive $700 a month in alimony for four years, and $400 a month thereafter. She was also to receive $900 a month in child support and a $45,000 property settlement. She has received no child support for five years. Her ex-husband presently owes her more than $60,000 in child support alone. She has received no alimony since 1979 and is owed approximately $40,000 in alimony from her ex-husband. She has tried to collect from her ex-husband, but neither the State of Illinois nor the State of California will assist her because she is not on welfare. The Debtor cannot afford to hire an attorney to help her collect the monies due to her. She did testify, however, that a law firm in California may help her pursue the claims against her ex-husband on a 40% contingency basis, if she can come up with enough money to cover costs.

**2.** A third daughter is fully emancipated, married, and lives in Massachusetts with her own family. The record is unclear with respect to the Debtor's son other than the fact that she is in no way responsible for his support.

**3.** The Debtor testified that she also borrowed some money from her mother and sister and also received food stamps while putting herself through the Art Institute School.

**4.** The State of Illinois got a state court judgment against her in the fall of 1987 and, in her words, "sent the sheriff out" after her.

**5.** She had previously been evicted from apartments many times and already has a $790 postpetition judgment against her for postpetition rent arrears. She is paying $25 a month towards this judgment.

**6.** The Debtor testified that she could not afford to fund a Chapter 13 plan. She says she cannot afford to make any payment on her prepetition unsecured debt. The question of whether a 0% or 1% plan could be confirmed should she file a Chapter 13 petition is not now before the Court.

well and once sat for six months while she saved up to pay for repairs. She cannot afford car insurance.

The Debtor testified that she is always looking for a new job. She testified that in October 1986 she became a manager at Citifax, but has "topped out" because it is a family owned business with all of the key positions filled by family members. She testified that she can go no higher in the company, that she has no decision making power and constantly worries about being replaced by a younger person. She also testified that she had no sales experience.

The Debtor testified that the budget she filed with her bankruptcy petition is very conservative. For example, she noted that the sum of $75.00 budgeted for clothing does not include clothing for her children.[7] In addition, her daughters also have medical expenses due to vision and dental problems, which she pays for.

The Debtor presently lives in a one bedroom apartment with her 18 year old daughter, Cathy and her 19 year old daughter, Ann.[8] Both Cathy and Ann work part time and summers. Ann attends Boston University and contributes almost the entire sum of her tuition and expenses through student loans and her job income.[9] The Debtor contributes approximately $1,000 a year plus one $275 airplane ticket towards Ann's college expenses. The Debtor's daughter Cathy has just graduated from high school and will be attending the University of Southern California beginning in the Fall of 1988. Cathy will provide almost the entire sum of her tuition and expenses through scholarships, other financial aid and her job income.[10] The Debtor will contribute approximately $800 a year plus one airplane ticket. The Debtor also testified that she contributes less than $200 a year to her 25 year old daughter for family emergencies.[11]

## DISCUSSION

The Debtor has asked this Court to discharge her student loan obligation under 11 U.S.C. § 523(a)(8)(B), claiming that repayment of the obligation would cause "undue hardship" on her and her children.[12] ISSC objects to a finding that the loan obligation is dischargeable. ISSC claims that repayment of the loan would not cause "undue hardship" because the Debtor earns a sufficient income to repay the loan. More importantly, ISSC argues that the Debtor has no obligation to support her daughters Ann and Cathy in their pursuit of college educations. Specifically, ISSC maintains that the Debtor should not have her student loan obligation discharged while contributing to the education of her daughters at private universities.[13]

Under 11 U.S.C. § 523(a)(8)(B) the Court can excuse a debtor in whole or in part from having to pay an otherwise nondischargeable debt if the Court finds that

7. The Debtor testified that "corporate dress" is required for her job.

8. She is current on her $520 per month rent.

9. Ann works at Krochs and Brentannos and babysits.

10. Cathy works at a restaurant and babysits.

11. This daughter has already graduated from college with some financial assistance from the Debtor. Although she is emancipated, from time to time she turns to her mother for emergency assistance.

12. 11 U.S.C. § 523(a)(8)(B) provides that:
(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt ...
    (8) for an education loan made ... by a governmental unit ... unless ...

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents....

13. ISSC takes the position that the Debtor's daughters could totally fund their own education at the University of Illinois or some other Illinois state college, and the Debtor could use the approximately $2,000 a year she will be contributing to her daughters' education to repay her own student loans. Alternatively, ISSC argues that the Debtor's loan obligation should not be discharged because in four years both daughters will have graduated from college and be totally emancipated, and the Debtor will have the funds she currently contributes to her daughters' education available to pay her own student loans.

repayment would work an "undue hardship" on a debtor and his/her family.[14] There is, however, a strong legislative and judicial policy against allowing a debtor to use bankruptcy to get out of repaying student loans. *See, e.g.,* H.R.Rep. No. 595, 95th Cong; 1st Sess. 132–33 (1977), U.S. Code Cong. & Admin.News 1978, 5787; *In re Brunner,* 46 B.R. 752 (S.D.N.Y.1985), *aff'd,* 831 F.2d 395 (2d Cir.1987). Thus, for the Court to discharge a debtor from his/her total student loan obligation the debtor must show that any repayment of the loan would be *more* than an inconvenience, cause a reduction in lifestyle or work a hardship on the debtor or his/her family. *See, e.g., In re Love,* 33 B.R. 753 (Bankr.E. D.Va.1983); *In re Rappaport,* 16 B.R. 615 (Bankr.D.N.J.1981).

■ Here there is no doubt that requiring payment of this loan would work a hardship on the debtor and her family. That is not the question before the Court. Rather, the question is whether requiring repayment would work an *undue* hardship. *See, e.g., In re Richardson,* 32 B.R. 5 (Bankr.S.D.Ohio 1983); *In re Fischer,* 23 B.R. 432 (Bankr.W.D.Ky.1982). In that regard, as opposed to the usual dischargeability case, once the creditor establishes that the loan in question is a student loan due less than five years (which is stipulated here), the burden shifts to the debtor to establish by a fair preponderance of the evidence that requiring repayment would work an *undue* hardship on the debtor or her family. *See In re Ealy,* 78 B.R. 897, 898 (Bankr.C.D.Ill.1987); *In re Keenan,* 53 B.R. 913, 916–17 (Bankr.D.Conn.1985).

■ Unfortunately, neither the Bankruptcy Code nor the legislative history to 11 U.S.C. § 523(a)(8) spells out in detail what constitutes *undue* hardship. The case law, however, has identified three tests to be applied in determining if facts and circumstances will satisfy the undue hardship standard. *See In re Feenstra,* 51 B.R. 107 (Bankr.W.D.N.Y.1985). The first test is a mechanical one under which the court compares the debtor's present and future income and expenses and surrounding circumstances [15] to determine whether it is reasonable to require the debtor to pay the loan in whole or in part. *See, e.g., In re Andrews,* 661 F.2d 702 (8th Cir.1981); *In re Love,* 33 B.R. 753 (Bankr.E.D.Va. 1983). The second test is a good faith test pursuant which the court inquires as to whether the debtor has made a good faith effort to begin repayment of the loan, to renegotiate the loan, and to minimize expenses and perhaps find a better paying job. *See, e.g., In re Holzer,* 33 B.R. 627 (Bankr.S.D.N.Y.1983). If the debtor is creating his/her own financial difficulties the court may well conclude that the debtor is not seeking discharge of his/her student loan obligation in good faith. *See, e.g., Holzer, supra.* Finally, the third test is a policy test whereby the court attempts to determine whether discharging part of or the entire student loan obligation would frustrate the Congressional policy underlying 11 U.S.C. § 523(a)(8). Among the factors the court should look to in this regard are whether the primary payment underlying the debtor's Chapter 7 filing was a desire to avoid paying student loans and whether the debtor's education funded by the loan is of a type which will enable the debtor to secure a high paying job in the foreseeable future. *See, e.g., In re Price,* 25 B.R. 256 (Bankr.W.D.Mo.1982).

While some courts focus on just one of the three tests, other courts use all three in a combination. *See, e.g., In re Wells,* 37 B.R. 684 (Bankr.N.D.Ill.1983), *aff'd,* 37 B.R. 687 (N.D.Ill.1984); *In re Johnson,* 5 B.C.D. 532 (Bankr.E.D.Pa.1979). *But see In re Courtney,* 79 B.R. 1004 (Bankr.N.D. Ind.1987). This Court believes that the better approach is to use all three tests in combination in determining whether a student loan should or should not be discharged on undue hardship grounds. The legislative history of 11 U.S.C. § 523(a)(8)(B), particularly the Report of the Commission on the Bankruptcy Laws

---

**14.** It is agreed that the loan in question has been due for less than five years.

**15.** These surrounding circumstances include health, family responsibility, employment prospects, education and skills.

of the United States, House Doc. No. 93–137, Pt. I, 93d Cong; 1st Sess. (1973) at 140–41, together with the decisions of other appellate, district and bankruptcy courts, *see In re Brunner*, 46 B.R. 752 (S.D.N.Y. 1985), *aff'd*, 831 F.2d 395 (2d Cir.1987) support the three test approach. This approach allows the court to define undue hardship in the context of a particular proceeding in light of both the debtor's unique situation and the policies underlying 11 U.S.C. § 523(a)(8).

■ Applying the first, mechanical, test the Court should compare the Debtor's present and future income with the Debtor's reasonably anticipated necessary expenses in order to determine whether it is reasonable to expect her to be able to pay back any of her student loan obligation in the reasonably foreseeable future. At the time of filing her petition the Debtor listed her monthly income as $1,425 and her estimated future monthly expenses at $1,462. However, in the Debtor's proposed finding of facts document filed with this Court on June 13, 1988 the Debtor indicates that her take-home pay is $1,665.71 per month and her expenses are approximately $1,610. While the Court may question some of the expenses listed in the June 13, 1988 filing,[16] the Court will use these more current figures in its analysis.

Apparently, at this point in time, the Debtor has a surplus of $55 a month in her budget. However, under the mechanical test analysis the Court must look to future earnings and expenses as well. *See In re Carter*, 77 B.R. 25 (Bankr.W.D.Pa.1987).

> The court must ask: Will the debtor's future financial resources for the longest feasible period of time allowed for repayment of the loan be sufficient to support the debtor and his [sic] dependent at a subsistence or poverty standard of living, as well as to fund repayment of the student loan?

*In re Johnson*, 5 B.C.D. 532, 544 (Bankr.E.D.Pa.1979). While the Debtor has testified that she has "topped-out" at her current job, she has in no way indicated that her salary will be cut in the future or that she will not receive, at a minimum, a cost of living raise each year. Thus, for purposes of analysis, the Court finds it likely that the Debtor will at least remain at the same level in present dollar terms in income for the foreseeable future. Further, while the Debtor is presently faced with many expenses involving her two daughters, the Court believes that these expenses will decrease over the next four years as the two daughters graduate from college and become totally emancipated. On the other hand, the Court has serious doubts as to whether the Debtor's budget is realistic. For example, she budgets $200 per month for payments to her daughters' college educations. However, the evidence suggests it is unlikely she will actually be able to give them that money and meet her other obligations at the same time. She testified to substantial anticipated expenses for required dental work. It is unlikely her eleven year old car will last much longer. Therefore, she will likely soon face unbudgeted car payments. The lack of reality in her budget is further evidenced by the judgment she already has against her for postpetition rent. Thus, it appears repayment of her student loan obligations would work an undue hardship on the Debtor for the next few years, even if the payments for the daughters' education are not made. However, once the daughters are emancipated, the Debtor, as a single person, living on a $25,000 per year income should, by careful budgeting, both be able to maintain a decent lifestyle and repay her student loans.[17]

■ The second test to be applied here is the good faith test. While the Court has no doubt that the Debtor is continuing to look for a better paying job and to mini-

---

16. For example, the Debtor lists $150 a month in expenses for utilities in a one-bedroom apartment.

17. Because of this holding, it is unnecessary to determine whether the Debtor, whose income level is concededly well above poverty levels even if her lifestyle isn't, is per se ineligible to have her student loans discharged in Chapter 7. *See, e.g., In re Bryant*, 72 B.R. 913 (Bankr.E.D.Pa.1987); *In re Frech*, 62 B.R. 235 (Bankr.D.Minn.1986).

mize her lifestyle as much as possible, the Court cannot overlook the allegations of ISSC that the Debtor has made no attempts to renegotiate her loan repayment schedule.[18] The question of payment for private college expenses for the daughters is more difficult. Assuming the Debtor can pay $200 per month towards her daughters' expenses at Boston University and University of Southern California, that is money she could pay towards her own student loans had the children chosen a state school. The State of Illinois has one of the finest state college systems in the United States. It is no hardship to have to go to college at Champaign–Urbana, Northern Illinois, Illinois–Chicago, Southern Illinois or any of the other fine schools in the Illinois state system. Therefore, while this Court (with a daughter of its own in college and another about to graduate from high school) is sympathetic to a strong parental desire to send children to the best possible college, the fact remains that the Debtor's decision to financially support her daughters decisions to attend private schools far from home is legally voluntary and to that extent, the expenses she bears in connection therewith must be regarded as self imposed. Thus, while the Court is sympathetic towards the Debtor's alimony/child support recovery dilemma[19] and what appears to be a long line of expenses attributable to sheer bad luck, the Court cannot conclude that the Debtor is seeking a total discharge of her student loan obligation in complete good faith.

Finally, there is the third test, the policy test. In applying the policy test courts have looked to both the percentage of the debtor's overall debt represented by the student loans the debtor seeks to discharge and to the financial benefits likely to accrue to the debtor as a result of the education those loans financed. *See, e.g., In re Price,* 25 B.R. 256 (Bankr.W.D.Mo.1982); *In re Johnson,* 5 B.C.D. 532 (Bankr.E.D. Pa.1979).[20] As to the percentage of the Debtor's debts represented by her student loans, the Debtor's schedule of debts is not attached to the Debtor's bankruptcy petition or contained in the Court file. All the Court could locate is an amendment to the schedule of debts listing approximately $575 worth of additional, previously unscheduled debt. However, the Debtor did testify that she owes approximately $36,000 in student loan obligations and her

---

**18.** In fact, it appears the Debtor has made no serious attempts to make any repayment of the loan. However, failure to make even a minimal repayment will not, however, result in a finding of lack of good faith when a debtor clearly has no funds to make any repayment. *See In re Courtney,* 79 B.R. 1004, 1011 (Bankr.N.D.Ind. 1987). There is little or no fat in the Debtor's present budget. The record of evictions and judgments for unpaid rent indicates that has been the Debtor's situation for a long time. This was confirmed by the Debtor's testimony which the Court found to be highly credible.

**19.** *See* footnote 1, *supra.*

**20.** The source of these "policies" is somewhat elusive. *See In re Courtney,* 79 B.R. 1004 (Bankr.N.D.Ind.1987). What the relevance of the percentage of student debt is in this regard is less than clear. "Policy" seems to forbid a debtor from using Chapter 7 "primarily" to get out of student loans, at least those less than five years old. This policy in effect says if a debtor runs up a large student loan debt, then policy dictates the debtor should run up large credit card debts or the like before filing bankruptcy in order to get out of the student loans. This seems like a strange policy. The second "poli-cy" looked to in the application of the policy test seems to say if the debtor profits financially from the student loan it is nondischargeable, while if it is of no financial benefit to the debtor, the loan should be discharged. This policy also seems contrary to common sense. Whether the debtor may ultimately benefit financially from the education she got using the loans should be considered in the mechanical test. What policy considerations are involved beyond prospective ability to pay is hard to ferret out. If the debtor can pay the student loan without undue hardship, it would seem she should pay it, regardless of whether the source of repayment is from money earned as an artist or a ditch digger. It may be the second policy test should be limited to those unusual situations, such as with medical school graduates, who may be on near poverty wages in the near term, but may be looking at large dollars down the road. *See, e.g., In re Frech,* 62 B.R. 235 (Bankr.D.Minn.1986). Despite the doubts expressed herein, the Court will follow precedent, and apply the policy test. *See, e.g., In re Wells,* 37 B.R. 684 (Bankr.N.D.Ill.1983), *aff'd,* 37 B.R. 687 (N.D.Ill.1984); *In re Johnson,* 5 B.C.D. 532 (Bankr.E.D.Pa.1979). However, the policy test has at best limited weight in the determination of this proceeding.

total prepetition debt equalled approximately $65,000. Thus, the Debtor's student loan debt equals approximately 55% of her scheduled debts. While the percent is somewhat high, in light of the Debtor's bleak financial condition the Court cannot conclude that the Debtor's chief purpose in filing the bankruptcy was to receive a discharge of her student loans.

The second part of the policy test looks to the potential financial benefits to the debtor on both a short term and long term basis resulting from the education financed by the loan the debtor seeks to discharge. There is no doubt this Debtor benefitted intellectually from the education she received. The Art Institute of Chicago enjoys a well deserved national reputation for excellence. However, her master's degree has produced little tangible benefit for the Debtor. While she is employed in graphics she is hardly making a magnificent salary. Given her lack of a teaching certificate or a Ph.D., her prospects in the field are seriously limited. Therefore the policy test, if it is relevant, is satisfied.

Looking at the analysis under all three tests, the Court cannot conclude that the Debtor would be subjected to an *undue* hardship if her discharge request were denied. However, the denial of a total discharge of the Debtor's student loan obligations does not prevent this Court from fashioning a more equitable repayment schedule.[21] *See In re Love*, 33 B.R. 753 (Bankr.E.D.Va.1983). *See also* 11 U.S.C. § 105(a).

The Court agrees with ISSC's suggestion that the Debtor's student loan obligation should be renegotiated to provide for a 20 year repayment period with a graduated repayment schedule beginning at $291 per month under 20 U.S.C. § 1078–3. However, all repayments should be deferred until August 1, 1992 without interest, to give both Ann and Cathy an opportunity to graduate from college. Even if both were in the Illinois state college system the Debtor would have additional food, housing and medical expenses, as well as other expenses, arising from parental obligation and from the daughters returning home for vacations. These expenses and obligations will end in four years when the daughters graduate and become totally emancipated. When the younger daughter has graduated but not before, the Debtor should have a sufficient surplus, after maintenance of a reasonable lifestyle, to repay her student loans in accordance with the schedule suggested by ISSC. Should a change of circumstances occur over the next four years, such as the Debtor's ex-husband being forced to live up to his obligations by either the State or the Debtor, or the Debtor's benefitting from a substantial increase in income, ISSC may seek earlier repayment. On the other hand, should the Debtor's situation deteriorate during the four year period or during the period of repayment, the Debtor may seek another determination of dischargeability in light of the then existing facts.

### CONCLUSION

IT IS HEREBY ORDERED that the Debtor's request for a discharge of her student loan obligation to ISSC under 11 U.S.C. § 523(a)(8)(B) is DENIED.

IT IS FURTHER ORDERED that repayment of the Debtor's student loan obligation is deferred for four years from the date of this Memorandum & Opinion.

IT IS FURTHER ORDERED that upon expiration of the four year deferment period the Debtor and ISSC shall renegotiate the debtor's student loan obligation under 20 U.S.C. § 1078–3.

---

21. In addition, if the repayment schedule does not work out, nothing prevents the Debtor from filing a new 11 U.S.C. § 523(a)(8)(B) complaint in the future based on changed circumstances. *In re Sobh,* 61 B.R. 576 (E.D.Mich.1986).