**Kelly J. VAUGHN, Plaintiff,**

v.

**ILLINOIS STATE SCHOLARSHIP COMMISSION, Defendant.**

No. 92–1384.

United States District Court, C.D. Illinois.

Feb. 8, 1993.

James S. Brannon, Peoria, IL, for plaintiff.

Richard K. Nowell, Asst. Atty. Gen., Mark E. Wilson, Asst. Atty. Gen., Chicago, IL, for defendant.

## ORDER

McDADE, District Judge.

This matter is before the Court on appeal from a ruling by United States Bankruptcy Judge William V. Altenberger. The Court has jurisdiction over this appeal pursuant to Bankruptcy Rule 8001(a). Debtor/Appellant Kelly Vaughn (Vaughn) argues that the bankruptcy court erred in declaring that Vaughn's student loan debt to Appellee Illinois State Scholarship Commission (Scholarship Commission) was not dischargeable in bankruptcy.

The standard of review of a bankruptcy court ruling is governed by Bankruptcy Court Rule 8013, which states:

On appeal the district court or bankruptcy appellate panel may affirm, modify or reverse a bankruptcy court's judgment, order of decree or remand with instructions for further proceedings.

Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witness.

11 U.S.C. Rule 8013. The Seventh Circuit in *Matter of Boomgarden,* 780 F.2d 657 (7th Cir.1985), states: "[W]e must accept the bankruptcy court's findings of fact unless they are clearly erroneous.... · We can, however, apply *de novo* review to conclusions of law of any lower court." *Id.* at 660 (citations omitted).

## BACKGROUND

The facts in this case are not in dispute and will be briefly discussed. Vaughn filed a Complaint to determine dischargeability of a debt owed to the Scholarship Commission. Vaughn is a single mother and was 26 years old on May 12, 1992, the date of the bankruptcy hearing on this matter. (Tr. 4). Vaughn graduated from Lewistown Community High School as an honor student and enrolled at Illinois State University. (Tr. 4, 16). At Illinois State, Vaughn studied graphic design and fine arts. Vaughn borrowed $11,300 and also worked approximately 30 hours a week to finance her university education. (Tr. 3–4). Vaughn had an "A" average in her major and a "B" average overall. (Tr. 16). Vaughn completed her studies in December of 1988 and graduated in May of 1989 with a degree in fine arts. (Tr. 4, 6).

During Vaughn's senior year at the university, and upon graduation, Vaughn mailed out over 100 resumes to prospective employers. (Tr. 7). She received a few rejection letters, but for the most part, received no responses at all. (Tr. 8). Unable to find work in her major, Vaughn worked as a waitress in January and February of 1989, earning an average of $150.00 a week. (Tr. 8–9). Vaughn then accepted a position as a night manager of a "place" earning $6.00 an hour. (Tr. 8).

In June of 1989, while still waitressing, Vaughn began paying 94.05 a month on her student loan. (Tr. 10). Vaughn continued waitressing until September of 1989 when she accepted a position with the *McLean County Community News* in Bloomington, Illinois as a spec artist. In this position, she designed and organized ads, designed the weekly magazine cover, and did paste-up layout. (Tr. 10–11). In November of 1990, after 14 months on the job, Vaughn was fired for personal differences with her supervisor. (Tr. 12).

Within two weeks of her discharge from the newspaper, Vaughn learned that she was pregnant. (Tr. 12). Vaughn then secured a position with Mid–Illinois Business Systems selling copiers and fax machines over the telephone. (Tr. 13). At the same time, she worked at a Y.M.C.A. as a receptionist. (Tr. 13). In January of 1991, Vaughn moved to Lewistown, Illinois, to be near her family. (Tr. 13).

Vaughn then began work as a personal care assistant for an elderly woman. After two months Vaughn quit this position because her pregnancy made it difficult for her to lift the elderly woman. (Tr. 13–14). In March of 1991, Vaughn started a desk job with the *Canton Daily Ledger* and worked there from the sixth month of her pregnancy until the ninth. (Tr. 14). Vaughn was replaced by the newspaper after having her baby and did not return to work. (Tr. 14).

At the trial, Vaughn testified that she received $60.00 a week in child support and $130.00 a week in unemployment compensation which, apparently, expired in November of 1992. (Tr. 18–19). Vaughn also receives $119.00 a month in food stamps and a medical card for which she pays $12.00 a month. (Tr. 12, 29). Vaughn substitute taught a couple of times a month, and the wages she earned were deducted from her unemployment. (Tr. 29–30).

Vaughn's expenses include $25.00 to $35.00 a month for baby clothes, $60.00 a month for diapers, $150 a week for food and toiletries, $200.00 for rent, utilities of $100.00 to $150.00 a month, miscellaneous home maintenance and repair of $60.00 a month, $40.00 to $50.00 a month for laundry, $40.00 a month for the telephone, renter's insurance of $25.00 a month, and miscellaneous expenses of $20.00 a month. (Tr. 19–22). Vaughn also owns a 1979 Che-

vette for which she pays $30.00 to $40.00 a month in gas and oil and $25.00 to $30.00 a month in insurance.[1] (Tr. 20–21).

At the trial, Vaughn testified that her education at Illinois State University left her unprepared for a job in her field. She testified that since graduation, she has learned that all graphic design is done by computer, and that Illinois State University teaches outdated illustration methods. (Tr. 17). She also testified, however, that she had gone to advertising agencies for portfolio reviews and tips on how to improve her portfolio. The agencies told Vaughn that she had a good portfolio, a good eye for design, and that she "should have no problem getting a job." (Tr. 16). However, the agencies suggested that she write to other agencies that had already rejected her. (Tr. 16).

At the time of the trial, Vaughn had paid down her original loan of $11,300.00 to $8,500. (Tr. 3).

## ANALYSIS

The relevant Bankruptcy Rule provides in pertinent part:

(a) A discharge under ... this title does not discharge an individual debtor from any debt ...

(8) for an educational loan made ... by a governmental unit ... unless ...

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents....

11 U.S.C. § 523(a)(8)(B).

Under this section, a court can excuse a debtor from having to pay an otherwise nondischargeable debt upon finding that repayment would cause the debtor undue hardship. *In re Roberson*, 138 B.R. 885 (N.D.Ill.1992); *In re Conner*, 89 B.R. 744 (Bankr.N.D.Ill.1988). However, "there is a strong legislative and judicial policy against allowing a debtor to use bankrupt-cy to escape repaying student loans." *Conner*, 89 B.R. at 747.

The Bankruptcy Code does not define what constitutes undue hardship. However, case law has developed a series of tests which may be employed in an undue hardship analysis. *Roberson*, 138 B.R. at 888. *Conner*, one of the more frequently cited case, identified a multi-tier analysis which is sensitive to the causes of undue hardship as well as the policies underlying 11 U.S.C. § 523(a)(8). *Conner*, 89 B.R. at 748.[2] This analysis was specifically set out in *Roberson*, 138 B.R. at 888, and provides as follows:

(1) Mechanical Test: The court must ask: Will the debtor's future financial resources for the longest foreseeable period of time allowed for repayment of the loan be sufficient to support the debtor and his dependent at a subsistence or poverty standard of living, as well as to fund repayment of the student loan? If this question is answered affirmatively, discharge of the student loan must be denied. If answered negatively, then the court must apply the good faith test:

(2) Good Faith Test: Here, the court asks two questions:

(a) Was the debtor negligent or irresponsible in his efforts to minimize expenses, resources, or secure employment?

(b) If "yes," then would lack of such negligence or irresponsibility have altered the answer to the mechanical question?

*If the answer to the first part of the good faith test is no, then the debtor should be discharged of the obligation to repay his student loan.* However, if the answer to both parts of the good faith test are "yes," then a presumption against discharge is established—which may be rebutted by a negative answer to the third and final test.

---

1. After Vaughn filed for bankruptcy, the Credit Union forgave the debt on her car loan and released the title of the vehicle to her. (Tr. 20).

2. Cases citing to *Conner* include: *In re Roberson*, 138 B.R. 885 (N.D.Ill.1992); *In re Bakkum*, 139 B.R. 680 (Bankr.N.D.Ohio 1992); *In re Reilly*, 118 B.R. 38 (Bankr.D.Md.1990); *In re Correll*, 105 B.R. 302 (Bankr.W.D.Pa.1989); *In re Cahill*, 93 B.R. 8 (Bankr.N.D.N.Y.1988).

(3) ... Policy Test: The court must ask: Do the circumstances—i.e., the amount and percentage of total indebtedness of the student loan and the employment of the petitioner indicate:

(a) That the dominant purpose of the bankruptcy petition was to discharge the student debt, or

(b) That the debtor has definitely benefitted financially from the education which the loan helped to finance?

If the answer to both parts of this question is "no," then the debtor should be discharged from his student loan obligation. If the court answers "yes" to either part of the question, then discharge should be denied.

*Roberson*, 138 B.R. at 888, (quoting, *In re Johnson*, 5 Bankr.Ct.Dec. (CRR) 532 (E.D.Pa.1979).

In the above test, if a "court finds the debtor to have undue hardship under the mechanical test and has satisfied the good faith test, its analysis should end at that point.... [o]nly if a debtor does not satisfy the good faith test does a court proceed to the policy portion of the analysis." *Roberson*, 138 B.R. at 888.

In the case at bar, the bankruptcy court did not apply the above test or any similar test. Rather, after hearing the evidence, the bankruptcy court stated:

I think the standard that courts have applied in these cases is whether the debtors have any kind of long-term incapacity such as some physical disability or some mental disability that prevents them from working. And, although it may be difficult for Ms. Vaughn to take care of herself and her child, it does seem to me that she is taking care of herself and her child. She's paying her living expenses. She may not be living in the custom—in a standard which she thought she was going to be living after graduation from college with a degree in fine arts, but she is living on a day-to-day basis. She does have a degree in college. She is capable of getting work. That degree that she received is some benefit to her. Many people don't end up working in the area where they major. She has worked in the area where she majored. She's had several jobs working as a paste-up artist for several newspapers. She's been told that she does have a good eye and she could get a job. So she may be going through a period that's difficult for her but I don't see anything here where she's any kind—got any kind of a long-range incapacity that would prevent her from getting a job in her chosen field. If I granted the discharge—hardship discharge, she could walk out of here and tomorrow she could get a job, and she could be earning a sizable income which would justify her repaying the loan. In the interim, as the old saying goes, you can't get blood out of a turnip. If she is in poor financial condition, the only thing she can do is pay her living expenses, there's no way the State or any collection agency can collect the debt from her. The state laws are protective of people who don't have excess income with which to pay their debts. So, in the short run, until she gets something better, it doesn't look like to me like the State can collect anything from her, and in the long run, if she does ever get a job that pays more, why then she would be in a position to repay the student loan, which she has received some benefit from by—by receiving a degree in fine arts. So for those reasons, I will deny the request.

(Tr. 36–37).

The bankruptcy court not only failed to apply the appropriate test, but, as articulated, the test applied is not even remotely similar to the three-fold test contemplated in *Conner*. Physical and mental incapacity are not *sine qua non* in determining undue hardship, and speculation about future earnings from a mythical job is equally inappropriate. The mechanical test does consider the debtor's "future financial resources," but in a realistic sense and not in the context used by the bankruptcy court. In *Roberson*, the court, in applying the mechanical test, made the following analysis:

Using a mechanical test, the bankruptcy judge compared the debtor's present

and future income with the debtor's reasonably anticipated necessary expenses in order to determine whether it was reasonable to expect him to repay any of his student loan obligation in the reasonable future. The bankruptcy judge found that debtor's assets were minimal and his greatest assets, his interest in his former marital residence, was limited. He further found debtor to be unemployed with minimal prospects for future employment, as he had no transportation and certain medical impediments, and that debtor's only consistent source of income was government assistance. The bankruptcy judge found undue hardship under the mechanical test.

*Roberson,* 138 B.R. at 887.

■ In the case at bar, the bankruptcy court failed to make such a thorough analysis of Vaughn's "future financial resources," but simply indicated that because Vaughn might get a good job in the future, she was not under an undue hardship in the present. Under this analysis, a debtor could never discharge a student loan because the debtor always has, at a minimum, the potential to find a good paying job. This Court recognizes that "undue hardship" "means more than having a tight budget or a present inability to pay ...," *In re Johnson,* 121 B.R. 91, 93 (Bankr. N.D.Okl.1990), and that mere current financial hardships should not trigger the discharge of a student loan. Nonetheless, the Court also believes that Vaughn's prospects for "earning a sizable income" from a "job in her chosen field" are not as rosy as the bankruptcy court, without a thorough analysis, suggests. The Court notes that Vaughn has had only two jobs related to her field and neither would support a single mother, her child, the necessary day care expenses for a working mother, as well as the many other living expenses. Additionally, even though some ad agencies suggested that she should be able to get a job in her field, that does not mean that such a job exists, that Vaughn would be hired, or that the job could meet her expenses. The Court notes that Vaughn received either rejections or no response from over 100 job inquiries and had already been rejected by

firms suggested to her by the ad agencies from whom she sought help.

In summary, the Court finds that the bankruptcy court inappropriately applied a standard involving long-term disability from physical or mental handicaps in deciding that Vaughn was not under an undue hardship and that her student loan was not dischargeable. The bankruptcy court should have applied the test set out in *Conner* and *Roberson.*

Accordingly, the decision of the bankruptcy court is REVERSED and REMANDED to the bankruptcy court for a determination of the dischargeability of Vaughn's student loan using the test set out above.