In re Linda Lorraine PILCHER, Debtor.

**HEMAR SERVICE CORPORATION OF AMERICA, INC., Appellant,**

v.

**Linda Lorraine PILCHER, Appellee.**

**BAP No. AZ–92–1574 RMeJ.**
**Bankruptcy No. 91–7200–PCT GBN.**
**Adv. No. 91–705–GBN.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Nov. 18, 1992.

Decided Jan. 21, 1993.

**596**

Alan Maclin, Jeffrey Redmon, St. Paul, MN, Alan Levinsky, Phoenix, AZ, for HEMAR Ins. Corp.

T.J. Pantaleo, Los Angeles, CA, for Linda Lorraine Pilcher.

Before: RUSSELL, MEYERS, and JONES, Bankruptcy Judges.

## OPINION

RUSSELL, Bankruptcy Judge:

The bankruptcy court granted the debtor's motion for summary judgment and denied the creditor's motion for summary judgment, holding that debtor's educational loan was not funded in part by a nonprofit institution and therefore not within the exception to discharge under § 523(a)(8)[1]. 139 B.R. 948. We REVERSE and REMAND.

## I. FACTS

The essential facts are not in dispute. Debtor/Appellee Linda Lorraine Pilcher ("Pilcher") filed a Chapter 7 petition on

1. Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rule 1001 *et seq.*

June 20, 1991. Shortly thereafter, Pilcher filed an adversary proceeding seeking a determination that a loan[2] she had received in 1988 to help finance her law school education was dischargeable under § 523(a)(8). The educational loan was made to Pilcher under the Law Access program which, *inter alia,* provides educational loans for law students and coordinates the entities participating in the process of generating these loans and related services.

Pilcher's complaint sought discharge based upon alleged undue hardship. The complaint identified HEMAR Service Corporation of America ("HEMAR Service") as the holder of the loan. HEMAR Service had serviced the loan on behalf of the actual holders, Norwest Bank of South Dakota, N.A. ("Norwest"), and later the Student Loan Marketing Association ("SLMA"), after the loan was sold by Norwest to SLMA.

HEMAR Insurance Corporation of America ("HEMAR Insurance") insured Pilcher's loan pursuant to a surety bond, and became holder of the loan when SLMA made a claim under the surety bond and assigned the loan to HEMAR Insurance. HEMAR Insurance, HEMAR Service, and Norwest are all participants to the Law Access program.

HEMAR Insurance was allowed to intervene and be joined as an additional defendant in the action. HEMAR Insurance answered Pilcher's complaint and asserted a counterclaim seeking judgment against Pilcher in the amount due on the loan plus attorney fees and costs, as provided in the promissory note executed by Pilcher. The counterclaim also sought a declaration that the indebtedness evidenced by the note was nondischargeable under § 523(a)(8).

Pilcher filed a "Motion for Judgment Discharging Loan" which the bankruptcy court viewed as a motion for summary judgment. Pilcher argued, among other things, that her loan was not excepted

2. The promissory note was in the principal amount of $9,917.00. As of January 29, 1992 the principal and interest owing was $12,778.33 ($11,720.54 principal; $1,057.79 interest). Interest continues to accrue at a variable rate set at 8.125% per annum as of January 29, 1992.

from discharge because the loan was not "made under any program funded ... in part by ... a non-profit institution" as required by § 523(a)(8). HEMAR Insurance responded and filed its own Cross Motion for Summary Judgment on two issues: (1) that the loan in question was made under a program funded in whole or in part by a non-profit institution and is therefore non-dischargeable; and (2) that Pilcher cannot, as a matter of law, establish undue hardship for purposes of § 523(a)(8).

The bankruptcy court granted Pilcher's motion for summary judgment finding that "there is no evidence that any nonprofit institution played a meaningful part in providing funds to the LAL program." In so finding, the bankruptcy court did not reach the issue of undue hardship and denied HEMAR Insurance's motion for summary judgment. We REVERSE and REMAND.

## II. ISSUES

1. Whether the bankruptcy court erred in granting Pilcher's summary judgment, and in denying HEMAR Insurance's summary judgment motion by finding that no evidence of meaningful participation by a non-profit institution existed in the loan program supplying Pilcher's loan.

2. Whether the court erred by denying HEMAR Insurance's summary judgment on the issue of hardship.

## III. STANDARD OF REVIEW

■ An order granting summary judgment is reviewed *de novo. In re Baird,* 114 B.R. 198, 201 (9th Cir. BAP 1990); *In re Marvin Properties, Inc.,* 854 F.2d 1183, 1185 (9th Cir.1988). In reviewing a summary judgment order, the task of an appellate court is the same as a trial court under Fed.R.Civ.P. 56. *Hifai v. Shell Oil Co.,* 704 F.2d 1425, 1428 (9th Cir.1983). Rule 56 is made applicable in bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7056. "Viewing the evidence in the light most favorable to the non-moving party, the appellate court must determine whether the bankruptcy court correctly found that there was no genuine issue of material fact and that the moving party is

entitled to judgment as a matter of law." *Baird* at 201; *Hifai* at 1428; *see* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

We review the bankruptcy court's factual findings under the clearly erroneous standard, while conclusions of law are reviewed *de novo. In re Deer Park, Inc.,* 136 B.R. 815, 817 (9th Cir. BAP 1992); *In re Holm,* 931 F.2d 620, 622 (9th Cir.1991); *In re Acequia, Inc.,* 787 F.2d 1352, 1357 (9th Cir.1986); Federal Rule of Bankruptcy Procedure 8013. The bankruptcy court's conclusions of law are reviewed *de novo. In re Bronner,* 135 B.R. 645, 647 (9th Cir. BAP 1992); *In re Pacific Far East Lines, Inc.,* 889 F.2d 242, 245 (9th Cir.1989); *In re McNutt,* 87 B.R. 84, 85 (9th Cir. BAP 1988).

## IV. DISCUSSION

A. *The plain meaning of § 523(a)(8) requires that the program be funded in part by a nonprofit institution.*

■ The question before this Panel is one of statutory construction. The fundamental cannon of statutory construction is that the starting point for interpreting a statute is the language of the statute itself. *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 557–558, 110 S.Ct. 2126, 2129–30, 109 L.Ed.2d 588 (1990); *Mansell v. Mansell,* 490 U.S. 581, 588, 109 S.Ct. 2023, 2028, 104 L.Ed.2d 675 (1989). "Absent a clearly expressed intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

Section 523(a)(8) reads in relevant part:
§ 523. **Exceptions to discharge.**
(a) A discharge ... does not discharge an individual debtor from any debt—
(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, **or made under any program funded in whole or in part by a governmental unit or nonprofit institution,** or for an obligation to

repay funds received as an educational benefit, scholarship or stipend, unless—

.        .        .        .        .

(b) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;

§ 523(a)(8) (emphasis added).

■ The bankruptcy court erroneously focuses on whether Pilcher's loan was partially funded by a nonprofit institution. However, the plain language of § 523(a)(8) indicates that it is the *program* that need be funded by a nonprofit institution. Section 523(a)(8) does not define "program," but the use of the modifier "any" suggests a broad definition. Congress did not use language indicating that the loan itself must be funded by a nonprofit institution, but that the program pursuant to which the loan was made be funded in part by a nonprofit institution.

Nothing in the legislative history surrounding this section evidences an intent to limit it solely to the funding of the loan itself. On the contrary, the legislative history would suggest that Congress intended an inclusive reading. This section was amended three times to expand the scope of coverage.

When enacted in 1978, section 523(a)(8) covered obligations "to a governmental unit, or a nonprofit institution of higher education, for an educational loan." Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, § 523(a)(8), 92 Stat. 2549 (1978).

The subsection was amended in 1979 to expand the coverage of obligations to include "educational loan[s] made, insured, or guaranteed by a governmental unit, or part by a governmental unit or nonprofit institution of higher education." Act of August 14, 1979, Pub.L. 96–56, § 3(1), 93 Stat. 387 (1979) (amending 11 U.S.C. § 523(a)(8) (Supp.1979)).

The subsection was again expanded by § 454(a)(2) of the Bankruptcy Amendment Act of 1984, removing the words "of higher education" to eliminate the inference that the section only applied to nonprofit institutions associated with higher education.

Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, § 454(a)(2), 98 Stat. 333 (Supp.1984) (amending 11 U.S.C. § 523(a)(8) (1982)).

The subsection was yet again expanded by the Crime Control Act of 1990 to include government made, insured or guaranteed educational benefit overpayments, and obligations to repay funds received as educational benefits, scholarships and stipends. Crime Control Act of 1990, Pub.L. No. 101–647, § 3631(a), 104 Stat. 4865 (1990) (amending 11 U.S.C. § 523(a)(8) (1984)).

Our reading is also consistent with the general legislative policy behind the enactment of § 523(a)(8), which was to curb abuses of the educational loan system by restricting the ability of a student to discharge an educational loan by filing bankruptcy shortly after graduation, and to safeguard the financial integrity of educational loan programs. *See e.g.,* 124 Cong.Rec. 1791–94 (1978).

This reading is also consistent with the decision in *In re Hammarstrom,* 95 B.R. 160, 165 (Bankr.N.D.Cal.1989). There, an educational loan initially made by a commercial lender, but immediately purchased by an nonprofit organization pursuant to prior agreement, was held nondischargeable under § 523(a)(8) because the initial loan and subsequent purchase were held to be part of a program receiving nonprofit funding. *Id.* at 165. The court stated:

I conclude that by using the broad language "made under any program funded in whole or in part by ... a nonprofit institution," Congress intended to include within section 523(a)(8) all loans made under a program in which a nonprofit institution plays any meaningful part in providing funds.

*Id.* at 165.

■ The Law Access program, through which Pilcher applied and received her loan, is such a program and that program did indeed receive nonprofit funding by the participation of nonprofit entities. We hold that the loan that Pilcher received was procured through the integrated services of the Law Access program, some of the par-

ticipants of which are nonprofit institutions.

### B. *The relevant program for purposes of § 523(a)(8) is the entire Law Access program.*

As described in the Law Access materials [3], Law Access is a national loan program, designed for law students, to assure law student access to three loan programs: The Guaranteed Student Loan (GSL); Supplemental Loans for Students (SLS formerly ALAS), both of which are federally subsidized, and Law Access Loan (LAL) which is a private loan that does not receive a federal subsidy. The various types of Law Access Program loans (GSL, SLS and LAL) were explained in a single brochure, and a student filled out a single application form to apply for any of the Law Access program's three loan programs.

Norwest Bank, Law School Admission Service, Inc. ("LSAS"), Higher Education Assistance Foundation ("HEAF"), HEMAR Service and HEMAR Insurance were all parties to an agreement coordinating the Law Access program—the Law Plan Multiparty Agreement ("Multiparty Agreement") [4], executed on July 1, 1986. The agreement defined the various terms and responsibilities of each party, culminating in the Law Access program. Of the five parties to the Multiparty agreement, two are nonprofit institutions: HEAF and LSAS. Norwest Bank, a profit-making enterprise, made all Law Access Loans under the terms of the Multiparty Agreement.

It is clear that the entire design of the Law Access plan was an integrated effort to provide a streamlined method for the procurement, processing and service of law school educational loans. The scheme was designed to coordinate the roles of the participants along functional lines to provide law students with an organized process for obtaining educational loans.

Essentially, Pilcher argues that her particular loan, a Law Access Loan (LAL), was made under the "Law Access: the Private Program," supplied by Norwest, and was not funded by a nonprofit institution. Therefore, she argues, it does not fall within § 523(a)(8). She contends that the "Private Program" is distinguishable from the "Law Access: The Federal Program," which does receive nonprofit funding. She points to the fact that the brochure refers to each of these as different "programs" not just loan types. Further, she points out that while the GSL, SLS and LAL could be applied for on the same application, different sections were required to be filled out for the different loans. A separate Supplemental Student Financial Application was required to obtain an LAL which was not required for the GSL and SLS. The Private Program LAL is not need based, but is credit based. The Private Program

---

**3.** The brochure entitled *Law Access: A National Loan Program for Legal Education,* describes the program:

I. WHAT IS LAW ACCESS
Law Access is a national loan program designed specifically for law students. It assures law students access to three loan programs. The Guaranteed Student Loan (GSL); Supplemental Loans for Students (SLS, formerly ALAS) are federally subsidized loans. The Law Access Loan (LAL) is a private loan and does not receive a federal subsidy.
Law Access is coordinated by the Law School Admission Council/Law School Admission Service (SLAC/LSAS). Both SLAC and LSAS provide a variety of services and publications related to law school admissions. These include the Law School Admissions Test, the Law School Data Assembly Service, and *The Official Guide to U.S. Law Schools: Prelaw Handbook.* The Council consists of all U.S. law schools approved by the American Bar Association and 14 Canadian law schools approved by the Federation of Law Societies of Canada.
SLAC/LSAS works with a number of government and financial organizations to deliver the loan program. These organizations are responsible for insuring loans and providing capital. Different guarantee organizations are involved with federally sponsored loans and the privately funded loan. For example, the Higher Education Assistance Foundation (HEAF) will guarantee federal loans. HEMAR insurance Corporation of America (HICA) will insure the private LAL. HEMAR Service Corporation of America (HSCA) will service all loans. Norwest Bank of South Dakota is the lender.
(AER at 30.)

**4.** This agreement was provided to the bankruptcy court and to the members of this Panel under seal. HEMAR Insurance has provided Pilcher a copy under a confidentiality agreement.

**600**

has private insurance while the Federal Programs are federally guaranteed.

Notwithstanding Pilcher's contentions, the overall educational loan program received nonprofit funding. As we have stated in the preceding section, § 523(a)(8) does not require that the actual loan itself be funded by a nonprofit institution.

C. *There is no statutory basis for inquiry into whether the participation was meaningful.*

Pilcher argues that if there was any involvement by the other participants of the Law Access program relative to her loan, it was minimal, citing the reference to "meaningful" participation in *Hammarstrom. Id.* at 165. She asserts that the five parties to the Multiparty Agreement had obligations that were several and distinct, each party being responsible for its own performance, and each having the ability to withdraw from the plan, evidencing that no one entity was vital for the plan's existence.

The "meaningfulness" of the participation of the nonprofit entities in Law Access or in Pilcher's loan, however, is not part of the statute. This is where we depart from the *Hammarstrom* decision. The plain language of § 523(a)(8) states that funding may be "in whole or in part." The addition of the meaningfulness requirement is purely a judicial creation. No qualifying language was included by Congress to establish minimum levels of participation. Therefore no inquiry into the meaningfulness of the participation is required.

Even if such inquiry be made, it is clear to this Panel that the integrated parts contributed to the success of the whole. Further, evidence in the record indicates that participation by a nonprofit entity was specifically instrumental to the availability of the loans [5].

This Panel disagrees with Pilcher's narrow reading of what constitutes the "program" for purposes of § 523(a)(8). We hold that the entire Law Access program is the relevant program for purposes of § 523(a)(8).

Pilcher's loan was procured through the services of the entire Law Access Program, which includes all the services associated with, and integral to, the operation of the overall program, which made all three types of loans available to law students. The services provided by Law Access include marketing, the production and distribution of the application and information booklet, review and processing of loan applications, coordination with the participating law schools, and originating, processing, servicing, insuring and guaranteeing the loans.

Simply stated, Pilcher's educational loan was obtained through the Law Access program. The Law Access program was partially funded by nonprofit institutions. The requirement for exception from discharge provided by § 523(a)(8) is therefore met, subject to a finding of no hardship.

The issue of whether a sufficient showing of hardship was made is a question of fact not reached by the bankruptcy court. We remand for further proceedings on this issue.

## V. CONCLUSION

We hold that the partial funding requirement for the applicability of § 523(a)(8) is met; therefore we REVERSE the granting of summary judgment to Pilcher and the denial of summary judgment to HEMAR Insurance. We REMAND for further proceedings on the issue of whether a hardship exists for purposes of § 523(a)(8).

---

**5.** In an affidavit before the bankruptcy court, Jon A. Veenis, Vice President of Norwest, stated that:

> 8. Norwest's participation in the Law Access Loan Program required the participation of a nonprofit guarantee agency such as HEAF.
> 9. Based upon information made available to me HEAF has made claims on loans to law students made under the Law Access Loan Program and its successor program in excess of $49,000,000.
> 10. Without this substantial funding by HEAF, the educational loans available under the Law Access Loan Program would not have been available to students.

(AER, Affidavit of Jon A. Veenis, at 140–141.)