In re Richard Emil HAMMARSTROM, Sr. and Sarah K. Hammarstrom, Debtors.

The EDUCATION RESOURCES INSTITUTE, INC., Plaintiff,

v.

Richard Emil HAMMARSTROM, Sr. and Sarah K. Hammarstrom, Defendants.

Bankruptcy No. 3–87–03913–E–LK. Adv. No. 3–88–0273–TC.

United States Bankruptcy Court, N.D. California.

Jan. 13, 1989.

Richard Hiersteiner, Sharon A. Morrissey, Csaplar & Bok, San Francisco, Cal., for plaintiff.

John T. Hansen, Maria L. Chan, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for defendants.

## OPINION

THOMAS E. CARLSON, Bankruptcy Judge.

This case presents two questions regarding the dischargeability of educational loans. The first question is whether an educational loan signed solely by the student's parent is nondischargeable pursuant to section 523(a)(8) of the Bankruptcy Code. The second question is whether an educational loan initially made by a commercial bank but immediately purchased by a nonprofit organization is covered by section 523(a)(8). I decide both questions in the affirmative.

## FACTS

For purposes of this motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court assumes to be true the following facts, which were alleged in Plaintiff's complaint or set forth in declarations accompanying Plaintiff's opposition to the motion to dismiss.[1]

Debtors Richard and Sarah Hammarstrom are a married couple. They have a son, Barry, who was a student at Brown University in 1987. In July 1987, Debtor Richard Hammarstrom submitted an application to borrow funds for their son's college expenses through a program called SHARE. SHARE is an educational loan program sponsored jointly by Brown University and New England Loan Marketing Program (Nellie Mae). Later that summer, Nellie Mae approved a loan in the amount of $25,768.31. On September 14, 1987, Richard Hammarstrom signed a promissory note in that amount. Barry Hammarstrom, the student for whom the funds were obtained, did not sign the promissory note.

The loan was funded in the following way. Nellie Mae, pursuant to a standing agreement with Bay Bank Boston, N.A. (Baybank), requested Baybank to draft a promissory note payable to Baybank and, upon receipt of the signed note, to distribute the loan proceeds to Brown University. Pursuant to the prior agreement with Baybank, Nellie Mae then immediately purchased the note from Baybank. Nellie Mae did not loan the funds directly because it was prohibited by law from doing so. Plaintiff The Education Resources Institute, Inc. (TERI) has guaranteed Hammarstrom's repayment of the loan. Both Nellie Mae and TERI are private nonprofit organizations engaged in providing guaranteed educational loans. Baybank is a commercial bank.

1. Normally, the court will consider only the allegations contained in the complaint in determining whether a complaint should be dismissed under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Here, Plaintiff alleged additional facts in declarations filed with its opposition to the motion to dismiss. It is well established that a court should not grant a Rule 12(b)(6) motion without leave to amend, if it appears that the Plaintiff can amend the complaint to allege facts sufficient to state a claim upon which relief can be granted. *See Sidebotham v. Robison,* 216 F.2d 816, 826 (9th Cir.1954).

It appears that Plaintiff in this case can amend its complaint to allege the additional facts set forth in its declarations. Defendants did not object in their Reply Brief to Plaintiff's filing those declarations. Rather, Defendants responded to the allegations contained in the declarations as if they were part of the complaint under examination. I thus conclude that the appropriate procedure is to consider the allegations contained in the accompanying declarations as if they were part of the original complaint and, if those allegations state a claim upon which relief can be granted, permit Plaintiff a reasonable period of time to amend the complaint formally to add those additional allegations.

Debtors filed a petition under chapter 7 of the Bankruptcy Code on December 15, 1987. Debtor Richard Hammarstrom failed to make the first payment on the promissory note, which came due in January 1988. Plaintiff then brought this lawsuit seeking a determination that the loan was not dischargeable in bankruptcy pursuant to section 523(a)(8) of the Bankruptcy Code. Debtor filed a motion to dismiss the lawsuit, contending that the loan at issue here is not an educational loan covered by section 523(a)(8), because the Debtor was not a student borrower and because a commercial bank made the loan.

## I

■ The principal question presented in this case is whether a promissory note evidencing an educational loan that is signed only by the student's parent is nondischargeable in the parent's chapter 7 bankruptcy pursuant to 11 U.S.C. § 523(a)(8). That section provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

> .    .    .    .    .

> (8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or a non-profit institution, unless—

> (A) such loan first became due before five years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or

> (B) excepting such debt from discharge under this paragraph will im-

pose an undue hardship on the debtor and the debtor's dependents.

The courts are divided on this question.[2]

The language of section 523(a)(8) does not limit its application to educational loans in which the student is the borrower. In this regard, it is worthy of note that section 523(a)(8) contains its own list of exceptions. The general rule that educational loans are nondischargeable does not apply only where the loan first becomes due more than five years before the bankruptcy petition is filed, or where excepting the debt from discharge would cause the debtor undue hardship. There is no stated exception to the general rule of nondischargeability on the basis that the borrower is not a student. I thus conclude that the plain meaning of the statute provides that covered educational loans are nondischargeable, irrespective of whether the student or some other person is the obligor under the promissory note.

The plain language of the statute notwithstanding, Debtor urges the court to conclude that section 523(a)(8) does not apply where the student's parent is the obligor, on the basis that the legislative history reveals that Congress' principal goal in enacting the statute was to curb fraudulent use of bankruptcy by students. I must reject this argument because it relies upon an improper use of legislative history, and because Debtor misstates the legislative history of the statute.

■ A court may not decline to follow the plain language of a statute merely because such language goes beyond Congress' primary stated goal in enacting that statute. To give statutory language other than its plain meaning, a court must find that a literal reading of the statute would actively frustrate the purpose of Congress

---

**2.** The following cases have held that section 523(a)(8) applies to non-student obligors. *See Education Resources Institute, Inc. v. Selmonosky,* 93 B.R. 785 (Bankr.N.D.Ga.1988); *In re Barth,* 86 B.R. 146 (Bankr.W.D.Wis.1988); *In re Wilson,* 76 B.R. 19 (Bankr.D.R.I.1987); *In re Feenstra,* 51 B.R. 107, 13 B.C.D. 370 (Bankr.W.D. N.Y.1985).

The following cases have held that section 523(a)(8) does not apply to non-student obli-

gors. *In re Meier,* 85 B.R. 805 (Bankr.W.D.Wis. 1986); *In re Behr,* 80 B.R. 124, 16 B.C.D. 988 (Bankr.N.D.Iowa, 1987); *In re Zobel,* 80 B.R. 950 (Bankr.N.D.Iowa, 1986); *In re Bawden,* 55 B.R. 459 (Bankr.M.D.Ala.1985); *In re Washington,* 41 B.R. 211 (Bankr.E.D.Va.1984); *In re Boylen,* 29 B.R. 924, 10 B.C.D. 874 (Bankr.N.D.Ohio 1983).

as revealed in unambiguous legislative history.

We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed intention to the contrary, that language must ordinarily be regarded as conclusive.

*Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). *Accord Board of Governors of the Federal Reserve System v. Dimension Financial Corp.,* 474 U.S. 361, 373–74, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1986); *In re Erickson Partnership,* 856 F.2d 1068, 1069–71 (8th Cir.1988); *In re Barth,* 86 B.R. 146, 149 (Bankr.W.D.Wis.1988).

The legislative history of section 523(a)(8) is contained almost entirely in the floor debates in the House of Representatives. Section 523(a)(8) was enacted as part of the Bankruptcy Reform Act of 1978. Educational loans were not excepted from discharge under the initial version of the bill, which was drafted by the House Judiciary Committee. *See* H.R. 8200, 95th Cong., 1st Sess. § 523 (1977); H.R.Rep. No. 595, 95th Cong., 1st Sess. 132–164 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Section 523(a)(8) originated as an amendment offered on the floor of the House by Representative Ertel of Pennsylvania. *See* 124 Cong.Rec. 1791–98 (1978). The Senate took up the Bankruptcy Reform Act only after it had passed the House containing section 523(a)(8). *See* Appendix 3, L. King, *Collier on Bankruptcy,* Part V at V–1 (15th Ed. 1988). There was no debate in the Senate regarding the dischargeability of educational loans, and the Senate made no material change in section 523(a)(8). *See* S. 2266, 95th Cong., 2d Sess. § 523(a)(8) (1978). As a result of this history, there is virtually no discussion regarding the purpose of section 523(a)(8) in the reports of either the House or Senate Judiciary Committees or in the Senate debates. *See e.g.,* Sen.Rep. 989, 95th Cong., 2d Sess. 79 (1978); 124 Cong.Rep. 28284, 32350–420, 34143–45. Virtually all such discussion is contained in the statements of the sponsors of the amendment embodying section 523(a)(8).

Debtor correctly notes that the sponsors of section 523(a)(8) thought it was inappropriate for a student to be able to discharge an educational loan by filing bankruptcy shortly after graduation.

The student does not have assets and would not, in the ordinary course of events, be able to obtain credit. Because of this and because of our interest in seeing that young people have an opportunity to obtain an education, we have made loans available to them by extending the credit of the United States to guarantee that this loan will be repaid.

The student on his part, not having assets to pledge, is pledging his future earning power. Having pledged that future earning power, if, shortly after graduation and before having an opportunity to get assets to repay the debt, he seeks to discharge that obligation, I say that is tantamount to fraud. It may not technically be fraud, but the student has pledged his future earning power for the payment of a debt that has been guaranteed by the United States, and then, rather than using that earning power to discharge the debt, as he has promised, he seeks, through bankruptcy, to be discharged of the debt, thereby making the taxpayers pay it for him.

124 Cong.Rec. 1793–94 (1978) (remarks of Representative Erlenborn).

The legislative history also reveals, however, that Congress had an additional purpose in enacting section 523(a)(8): to preserve the financial integrity of educational loan programs. Representative Ertel, the prime sponsor of section 523(a)(8), made that goal his primary argument in favor of the statute.

The purpose of this particular amendment is to keep our student loan programs intact. As many Members know, the default rate in the student loan program has been escalating to tremendous proportions in the past year. In accordance with that, the number of students going into bankruptcy—or ex-students— has increased over the years 1965

through 1972, by 1,200 percent for the years 1972 through 1975. The Washington, D.C., student loan program has collapsed and suspended its program, because there is no more money.

What happens with these programs is that as people borrow the money, go to school and then repay it to the educational institution, when it becomes due approximately 1 year after completion of school. After repaying this loan, this money goes into a revolving fund which is then available for other students on down the line. When they default and do not pay, and eventually reach the bankruptcy stage, we are penalizing students who are coming along through the system.

. . . . .

... Without this amendment, we are discriminating against future students, because there will be no funds available for them to get an education.

124 Cong.Rec. 1791 (1978) (remarks of Rep. Ertel). Other proponents of section 523(a)(8) also cited its effect in preserving the financial integrity of educational loan programs. *See Id.* at 1792 (remarks of Rep. Mottl).

This legislative history offers no basis for not enforcing the literal language of section 523(a)(8) to bar the discharge of educational loans signed by a student's parent.

First, there is no clear evidence in the legislative history that Congress intended otherwise nondischargeable educational loans to be dischargeable merely because the maker of the promissory note is someone other than the student. Neither the floor debates nor the legislative history contain a single word about non-student obligors. Although there are occasional references in the legislative history to non-student co-makers, these references state only that co-makers are generally not required on educational loans. *See* H.R.Rep. 595, 95th Cong., 1st. Sess. 133, 136, 154 (1977).

Second, the legislative history reveals that a major purpose of Congress in enacting section 523(a)(8) was to safeguard the financial integrity of educational loan programs by limiting the instances in which such obligations can be discharged in bankruptcy. *See* 124 Cong.Rec. 1791–92 (1978). This goal is served by barring discharge of educational loans signed by parents. A loan program is affected just as much when a parent discharges a loan as when a student discharges a loan.

Third, even if Congress' primary goal in enacting section 523(a)(8) was to prevent abusive discharge of educational loans by students, barring discharge of educational loans signed by parents does not interfere with that goal. The mere fact that the statutory language extends the effect of the statute beyond the primary goal enunciated by Congress is not a valid reason not to give the statutory language full effect. To restrict application of the statutory language to only those circumstances in which the primary purpose of the statute is served would give the legislative history more weight than the language of the statute in determining Congress' intent. Such an approach would be directly contrary to established rules of statutory construction.

The "plain purpose" of legislation, however, is determined in the first instance with reference to the plain language of the statute itself. *Richards v. United States*, 369 U.S. 1, 9 [82 S.Ct. 585, 591, 7 L.Ed.2d 492] (1962). Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

*Board of Governors of the Federal Reserve System v. Dimension Financial*

*Corp.*, 474 U.S. 361, 373–74, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1986).

Finally, accepted rules of statutory construction are not to be altered merely because exceptions to discharge are generally construed narrowly. Judge Martin stated this principle forcefully in *In re Barth:*

> While it is true that section 523(a)(8) runs counter to the general "fresh start" philosophy of the Bankruptcy Code, the same could be said of any exception to discharge. The exceptions to discharge exist because Congress felt that other public policies outweighed the debtor's need for a fresh start. Although exceptions to discharge are to be construed narrowly, that approach to construction is not a suitable basis for a court to override the plain language of the statute creating the exception.

86 B.R. 146, 149 (W.D.Wis.1988).

## II

■ The second question presented in this case is whether the loan falls outside section 523(a)(8), because a for-profit, nongovernmental commercial bank distributed the funds. Because the loan in question here was not "made, insured, or guaranteed by a governmental unit," it is nondischargeable under section 523(a)(8) only if it was "made under any program funded in whole or in part by ... a nonprofit institution." Nellie Mae and TERI are nonprofit institutions, but Baybank is not. Debtor contends that because Baybank is the obligee on the promissory note and disbursed the funds, Baybank rather than Nellie Mae "funded" the loan in question and section 523(a)(8) does not apply. I do not agree.

Read carefully, the relevant portion of section 523(a)(8) renders an educational loan nondischargeable if two requirements are met. First, the loan must be made pursuant to a "program" for providing educational loans. Second, that *program* must be "funded" at least in part by a nonprofit organization. Plaintiff's allegations satisfy both these requirements.

Plaintiff has clearly alleged that the loan was made pursuant to a program for providing educational loans. Nellie Mae and Baybank had entered into an agreement whereby Nellie Mae would purchase from Baybank loans made to pay expenses of higher education. This thirteen-page contract, entitled Education Loan Purchase Agreement (the Agreement), provides in relevant part:

> WHEREAS, Nellie Mae desires to purchase certain Education Loans from the Lender to assist in the promotion and availability of funds for purposes of obtaining a post-secondary education; and
>
> WHEREAS, the Lender desires to sell certain Education Loans to Nellie Mae and to originate new Education Loans to assist students and families in financing the costs of a post-secondary education;
>
> NOW THEREFORE, in consideration of the premises and mutual covenants herein contained, the parties hereto agree as follows ...

It is clear that the instant loan was part of the Nellie Mae–Baybank program because the promissory note was made on a printed form that refers repeatedly to Nellie Mae and TERI.

Plaintiff has also alleged facts sufficient to establish that the Nellie Mae–Baybank loan program was funded at least in part by Nellie Mae. I conclude that by using the broad language "made under any program funded in whole or in part by ... a nonprofit institution," Congress intended to include within section 523(a)(8) all loans made under a program in which a nonprofit institution plays any meaningful part in providing funds.[3] It appears from the Agreement that the parties contemplated from the outset that Nellie Mae would pur-

---

**3.** To the extent the statutory language is not conclusive, the legislative history supports this reading of the statutory language.

When enacted in 1978, section 523(a)(8) covered obligations:

> to a governmental unit, or a nonprofit institution of higher education, for an educational loan.

The statute was amended in 1979 to cover the following obligations:

> educational loan[s] made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or part by a governmental unit or nonprofit institution of higher education.

Pub.L. 96–56 (1979).

chase the promissory notes evidencing the educational loans. The Agreement provides in relevant part:

> Lender agrees to sell to Nellie Mae and Nellie Mae agrees to buy from the Lender a portfolio of Education Loans in the aggregate outstanding unpaid principal amount set forth in Exhibit A hereto or as otherwise agreed to by the parties involved.
>
> Nellie Mae agrees to purchase the Education Loans pursuant to paragraph 2.A. hereinabove at a price equal to one hundred percent (100%) of the outstanding unpaid principal amount thereof on the Loan Settlement Date plus accrued interest.

By agreeing to purchase promissory notes promptly after they were made, Nellie Mae in every practical sense performed the role of supplying funds for the loan program.[4] At the same time, the prearranged purchase of notes reduced the functional role of Baybank to acting as a mere agent for Nellie Mae. To conclude that the Nellie Mae–Baybank loan program was not funded at least in part by Nellie Mae under the circumstances alleged here would be wholly to ignore the substance of the transaction between the parties.

CONCLUSION

Defendants' motion to dismiss is denied. Within 20 days Plaintiff shall file an amended complaint setting forth the additional allegations contained in the declarations accompanying its objection to the motion to dismiss.

The sponsors of the 1979 amendment explained that it was intended to bring within the scope of section 523(a)(8) educational loans not directly payable to the government or non-profit institutions.

> Without this provision only those student loan obligations repayable directly to the Federal Government or to a nonprofit institution of higher education will be dischargeable. This amendment rationalizes nondischargeability student loans and reestablishes as the law what Congress intended in its initial treatment of the subject in the Higher Education Act.

125 Cong.Rec. 21935 (1979) (remarks of Rep. Edwards). *See also* Sen.Rep. 230, 96th Cong., 1st Sess. 1–3 (1979), U.S.Code Cong. & Admin. News 1979, p. 936.

The coverage of section 523(a)(8) was further broadened in 1984 to delete the words "of higher education" following the words "nonprofit institution." Pub.L. 98–353 (1984).

**4.** The agreement did not require Nellie Made to purchase all educational loans made by Baybank. By its own terms, however, section 523(a)(8) applies where the loan program is funded even *in part* by a non-profit organization.