**In re James M. VOTRUBA & Nancy J. Votruba, Debtors.**

**James M. Votruba, Plaintiff,**

**v.**

**Florida Department of Education, et al., Defendants.**

**Bankruptcy No. 03–18689. Adversary No. 03–1426.**

United States Bankruptcy Court, N.D. Ohio, Eastern Division.

June 16, 2004.

Susan M. Gray, Rocky River, OH, for Debtors.

### MEMORANDUM OF OPINION
### AND ORDER

RANDOLPH BAXTER, Chief Judge.

In this voluntary Chapter 7 proceeding, James M. Votruba ("Debtor") seeks to obtain a discharge of eleven loans he obtained under the Parent PLUS Loans program to defray the educational expenses for his three children. The Debtor seeks this determination pursuant to the undue hardship provision of 11 U.S.C. § 523(a)(8). This matter presents two dispositive issues. First, when a debtor is the sole-maker and obligor on loan debts that benefitted his children, but provided no educational benefit to himself, will 11 U.S.C. § 523(a)(8) apply making the debt nondischargeable unless undue hardship is established? If so, has the Debtor demonstrated such an undue hardship? The Court finds that § 523(a)(8) applies to parent-obligors and that the Debtor has established an undue hardship sufficient to warrant an equitable remedy of partial discharge of his PLUS loan debts. Core jurisdiction of this matter is acquired under provisions of 28 U.S.C. § 157(b)(2)(I), 28 U.S.C. § 1334, and General Order No. 84 of this district. Following a trial on the matter, and an examination of the evidence and record, generally, the following find-

ings of fact and conclusions of law are rendered.

\* \* \* \* \* \*

The Debtor is 53 years old and has a high school education. At the time of trial, the Debtor was unemployed. Previously, the Debtor had been employed at the LTV Steel Company ("LTV") for thirty-two years. Due to the bankruptcy and eventual closing of LTV, the Debtor's job was terminated on January 31, 2002. The Debtor and his wife, Nancy Votruba, jointly filed for Chapter 7 relief on July 2, 2003. According to the Debtors' Schedule F, they have approximately $198,390.55 in outstanding unsecured debt of which approximately $100,478.51 is attributable to the subject loans held by the three parties Defendant, the Florida Department of Education ("FDOE"), the United States Department of Education ("DOE"), and Educational Credit Management Corporation ("ECMC").[1] On October 14, 2003, the Debtor commenced this adversary proceeding to have the subject loans declared dischargeable on the basis that the debts impose an undue hardship pursuant to § 523(a)(8) of the Bankruptcy Code.

Between 1993 and 2001, the Debtor executed eleven educationally related promissory notes, known as PLUS loans, to help fund the college educations of his three children.[2] A PLUS loan, an acronym for Parent Loan for Undergraduate Students, is authorized by 20 U.S.C. § 1078–2. It is one of the four kinds of loans offered pursuant to the Federal Family Education Loan Program, and they are insured by the federal government. 20 U.S.C. §§ 1077 & 1078–2. PLUS loans are available to parent borrowers who do not have an adverse credit history. Loans made under the PLUS program impose sole liability for repayment of the loan on the parent. Repayment of the loans commences sixty days after the loan is disbursed by the lender, subject to any deferral period. *Id.*

The parties have stipulated to the authenticity of the PLUS promissory notes, the loan balances, and the payments made by the Debtor. The Debtor owes approximately $100,478.51 on his eleven PLUS loans and has made payments in the total amount of $25,995.51.[3] The parties stipulated that the Debtor began repaying the PLUS loans in 1995 and that the last payment made by the Debtor occurred in March of 2003. The current rate of interest on the FDOE loans is 4.22%. *See* FDOE Exhibit G. The interest rate on the DOE and ECMC loans is currently 4.05%. *See* DOE Exhibit A–2 & B–2; ECMC Exhibit G.

The repayment period of PLUS loans is not to exceed 10 years, but this does not include forbearance or deferment periods. *See* FDOE Exhibit A–2. However, debts may be consolidated and repayment periods can then be extended. The Debtor and the FDOE stipulated that four of the five loans held by the FDOE were in forbearance at the time the Debtor filed his

---

1. FDOE is the assignee of Sallie Mae and NLMA. Defendant ECMC is the assignee of Great Lakes Higher Education Corporation.

2. Five of the loans are held and guaranteed by the FDOE, four are held by ECMC, the remaining two are held by the DOE.

3. The Debtor and FDOE have stipulated that the Debtor owes the FDOE $66,614.48 as of May 11, 2004, and that the Debtor has made payments totally $3,555.00. The Debtor and the DOE stipulated that as of January 27, 2004, the Debtor owes $15,358.02 and has paid $6,807.54. ECMC and the Debtor have stipulated that the total amount due on the ECMC loans as of March 2004 is $18,506.01. ECMC and Debtor also stipulate that the Debtor has made payments in the amount of $15,632.97.

bankruptcy petition.[4] The DOE and the Debtor stipulated that the Debtor used grace periods and forbearances with regard to the two DOE loans. All of the parties stipulated that these PLUS loans are not eligible for the Income Contingent Repayment Program.

\*     \*     \*     \*     \*     \*

In support of his discharge Complaint, the Debtor contends that even though he and his wife have minimized their monthly expenses, their expenses still exceed their income. At present, their income is insufficient to cover their mortgage, and neither the Debtor nor his wife have any prospects for substantially higher income. The Debtor asserts that even if he is able to obtain employment, his potential earning capacity will never allow him to repay the student loan debt without imposing an undue hardship. Further, the Debtor states that he has attempted in good faith to repay the loans, but has not been able to do so due to adverse employment circumstances. While he was employed at LTV, the Debtor paid the loans as they came due, sometimes even paying more than was required. The Debtor took advantage of grace periods and forbearances, and refused to take out more loans after he lost his job, even though they had been offered to him.

The Defendants contend that the Debtor has failed to demonstrate undue hardship. They argue that the Debtor is trying to maintain his "LTV lifestyle" and has not sufficiently minimized his living expenses. Additionally, the Defendants contend that the Debtor has sufficient assets, including his home and his IRA accounts, to pay off the PLUS loans.

\*     \*     \*     \*     \*     \*

The contentions of the parties reveal two dispositive issues. First, does § 523(a)(8) apply to this particular Debtor, the sole-maker and obligor on the loans from which he derived no educational benefit. If so, has the Debtor sufficiently demonstrated an undue hardship that warrants a full discharge of his debts.

\*     \*     \*     \*     \*     \*

■ Section 523(a)(8) provides in pertinent part that "a discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents. . . ."

Section 523(a)(8) was enacted as part of the Bankruptcy Reform Act of 1978. At that time, § 523(a)(8) provided that student loans were excepted from discharge unless the debtor could prove an undue hardship or the loan first became due five years prior to the debtor's petition. Since its enactment, Section 523(a)(8) has been amended several times. By increasing the types of loans to which § 523(a)(8) applies and by eliminating the time period exceptions, Congress has made it more difficult to obtain a discharge on student loans. Currently, undue hardship is the only statutory exception to the nondischargeability of student loans.

4. The fifth loan held by the FDOE was in default at the time of the Debtor's petition. The Debtor explained that the default was due to inadvertence on the Debtor's part. The Debtor thought he had put the loan in forbearance with the four other loans. *Debtor, Cross Examination.*

A review of the legislative history of § 523(a)(8) reveals that "the exclusion of educational loans from the discharge provisions was designed to remedy an abuse by students who, immediately upon graduation, filed petition for bankruptcy and obtained a discharge of their educational loans." *Andrews Univ. v. Merchant (In re Merchant)*, 958 F.2d 738, 740 (6th Cir.1992)(citing H.R.Rep. No. 95–595 at 466–475 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6093–95).

In the legislative history, the issue of a non-student or parent borrower is not directly discussed. The focus of the legislative history is on preventing abuse by student debtors. *Id.; Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 130 (8th Cir. BAP 1999). The Third Circuit has considered the issue of whether a non-student co-obligor of an educational loan may be discharged from that debt in bankruptcy without proving undue hardship. *In re Pelkowski*, 990 F.2d 737 (3rd Cir.1993). The Third Circuit held that § 523(a)(8) was sufficient to preclude discharge of educational loans not only of a student borrower, but also of a non-student co-obligor. *Id.* at 741–742. In discussing the issue, the Third Circuit found the following:

> We find no support in the statutory language for any distinction based on the status of the borrower as student or as beneficiary of the education. Section 523(a)(8) does not refer to a "student debtor" but applies to limit discharge of any "individual debtor" from "any debt" for a covered educational loan. In the absence of clearly expressed contrary legislative intent, the statutory language must be regarded as conclusive.... [T]he language and structure of the statute reveal no intent to restrict its reach to student debtors for expenses for their own education.... If Congress intended that section 523(a)(8) not apply

to non-student co-makers of educational loan debt, we assume it would have so stated.... [T]he statute [has been] amended on several occasions, always expanding its coverage, demonstrating congressional intent to make the discharge of educational loan debt more difficult for all debtors.

*In re Pelkowski*, 990 F.2d at 741–743 (citations omitted).

In reaching this conclusion, the Third Circuit recognized that there was a split of authority regarding the dischargeability of educational loans as to non-student co-obligors. *Id.* at 738. Many courts have come to the same conclusion as the Third Circuit and have found that educational loans signed by both the student and the non-student parent are nondischargeable under § 523(a)(8) as to the non-student. *See, e.g., In re Hamblin*, 277 B.R. 676 (Bankr. S.D.Miss.2002); *In re Dull*, 144 B.R. 370 (Bankr.N.D.Ohio 1992); *In re Hawkins*, 139 B.R. 651 (Bankr.N.D.Ohio 1991); *In re Martin*, 119 B.R. 259 (Bankr.E.D.Okla. 1990); *In re Hudak*, 113 B.R. 923 (Bankr. W.D.Pa.1990); *In re Taylor*, 95 B.R. 550 (Bankr.E.D.Tenn.1989); *In re Hammarstrom*, 95 B.R. 160 (Bankr.N.D.Cal.1989); *Matter of Barth*, 86 B.R. 146 (Bankr. W.D.Wis.1988); *In re Feenstra*, 51 B.R. 107 (Bankr.W.D.N.Y.1985).

However, based on the legislative history some courts have found that the debt of a non-student co-obligor is dischargeable without a showing of undue hardship, because the educational loans of § 523(a)(8) include only debts incurred by a student for his or her own education. *See, e.g., In re Pryor*, 234 B.R. 716 (Bankr.W.D.Tenn. 1999); *In re Kirkish*, 144 B.R. 367 (Bankr. W.D.Mich.1992); *In re Behr*, 80 B.R. 124 (Bankr.N.D.Iowa 1987); *In re Meier*, 85 B.R. 805 (Bankr.W.D.Wis.1986); *In re Zobel*, 80 B.R. 950 (Bankr.N.D.Iowa 1986);

*In re Bawden,* 55 B.R. 459 (Bankr. M.D.Ala.1985); *In re Washington,* 41 B.R. 211 (Bankr.E.D.Va.1984); *In re Boylen,* 29 B.R. 924 (Bankr.N.D.Ohio 1983).

This case presents the issue of whether the sole-maker of the notes, the non-student, parent Debtor, can have his PLUS loans discharged without proving undue hardship. Every court that has considered the issue of a non-student, sole-obligor has found that § 523(a)(8) prevents discharge unless the Debtor can show undue hardship. *See, e.g., In re Hamblin,* 277 B.R. 676 (Bankr.S.D.Miss.2002); *In re Clark,* 273 B.R. 207 (Bankr.N.D.Iowa 2002); *In re Uterhark,* 185 B.R. 39 (Bankr. N.D.Ohio 1995); *In re Hawkins,* 139 B.R. 651 (Bankr.N.D.Ohio 1991); *In re Hudak,* 113 B.R. 923 (Bankr.W.D.Pa.1990); *In re Hammarstrom,* 95 B.R. 160 (Bankr. N.D.Cal.1989); *In re Martin,* 119 B.R. 259 (Bankr.E.D.Okl.1990).

Because of the plain language of the statute and the weight of the authority, the Debtor will need to establish "undue hardship" in order to have his student loan obligations discharged. *Lamie v. U.S. Trustee,* —— U.S. ——, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004)("The starting point in discerning congressional intent is the existing statutory text and not the predecessor statutes. It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'") (citations omitted).

■■■ In order to fully resolve this matter, the Court must determine whether the Debtor is currently and will continue to undergo a hardship sufficient enough to warrant a discharge of his remaining PLUS loan debt. The Debtor bears the burden of proving an undue hardship by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654,

112 L.Ed.2d 755 (1991); *In re Dolph,* 215 B.R. 832, 836 (6th Cir. BAP 1998); *Douglass v. Great Lakes Higher Education Servicing Corporation,* 237 B.R. 652 (Bankr. N.D.Ohio 1999). Once the Debtor has made a showing that would support a determination that undue hardship exists, the burden of production then shifts to the Defendant PLUS loan creditors to present some evidence to rebut the Debtor's case. *In re Parks,* 293 B.R. 900, 902 (Bankr. N.D.Ohio 2003).

■■■ The term "undue hardship" is not defined in the Bankruptcy Code, and the legislative history does not define the nature of the undue hardship exception. *See In re Andresen,* 232 B.R. at 130. Congress afforded discretion to the courts to develop a formula for determining undue hardship. The Sixth Circuit has not adopted a single specific test to determine undue hardship. Instead, it has applied various forms of the *Brunner* test in combination with the totality of the circumstances test. *Brunner v. New York State Higher Educ. Serv. Corp.,* 831 F.2d 395 (2d Cir.1987). *See In re Hornsby,* 144 F.3d 433 (6th Cir.1998); *Rice v. United States (In re Rice),* 78 F.3d 1144 (6th Cir.1996); *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman),* 25 F.3d 356 (6th Cir.1994). The *Brunner* test as set forth in *Cheesman* requires that the debtor demonstrate "(1) that the debtor cannot maintain based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and (3) that the debtor has made a good faith effort to repay the loans." *In re Cheesman,* 25 F.3d at 359 (*quoting Brunner,* 831 F.2d at 396). In addition to the three-pronged test delineated in *Brunner,* the

Sixth Circuit has considered objective factors including the amount of the debt, the rate of interest on the debt, the debtor's attempts to minimize expenses, as well as the debtor's income, earning ability, health, educational background, dependents, age, accumulated wealth, and professional degree. *In re Rice,* 78 F.3d at 1149–1150.

■ This Court has considered the *Brunner* test while applying other objective factors, so that the totality of the Debtor's circumstances is considered in making the undue hardship determination. The first prong of the *Brunner* test has clearly been met by the Debtor. At present, the Debtor cannot maintain a minimal standard of living for himself and his wife if he was required to repay the student loan obligations. Currently, the Debtor's monthly income is $1090.53. This consists of the Debtor's LTV pension income of $724.55 [5] and his wife's average monthly income of $365.98. [6] Nancy Votruba works for the Avon Lake School System where she grosses $1,159.79 a month for nine months of the year, but this is reduced to a net income of $365.98 a month on an annual basis because of health insurance premiums. Previously, the Debtor received unemployment compensation, but this ran out in early 2004. *Debtor,* Direct. A monthly income of $1090.53 is barely above the poverty level for two people. [7] While a "minimal standard of living" has not been definitively defined by the courts, an income at or near the poverty level is certainly minimal. Additionally, the Debtor

testified that their current income is insufficient to meet their monthly obligations and that they are only able to "keep afloat" because of financial help from the Debtor's brother. *Debtor,* Direct.

■ The Defendants argue, without evidentiary support, that the Debtor has the ability to maintain a minimal standard of living as well as repay his remaining student loan obligations. In support of this contention, the Defendants allege that the Debtor has not minimized his monthly expenses, specifically his cable, internet and phone bills. This Court has the authority to calculate the Debtor's average monthly expenses and, in its discretion, determine what expenses are reasonable. *See In re Pena,* 155 F.3d 1108, 1112 (9th Cir.1998). The Debtors provided the Court with a monthly expense chart that showed that their average monthly expenses total $2987.64. [8] *See* Plaintiff's Exhibit 10. Of these expenses, the Court finds that, with the exception of the Debtor's cable and internet bill, the Debtor's expenses are reasonable and modest for the Debtor's financial situation. The cable and internet bill is not relatively excessive and is not in and of itself evidence of an extravagant lifestyle. The Defendant creditors' intimation that the Debtor is attempting to live his "LTV lifestyle" is a conclusory statement that was not substantiated by any evidence of record. The $115.84 monthly expense attributable to the cable and internet bill will be excluded from the Debtor's expense total. With that deduction

---

5. The Debtor's pension is paid by the Pension Guaranty Benefit Corporation.

6. The average monthly income of Nancy Votruba was calculated by dividing her total net income from February 2003 to January 2004 and dividing by twelve. The figures used were provided in Plaintiff's Exhibit 9.

7. According to U.S. Department of Health and Human Services the 2004 poverty level for two people is $13,000 per year or $1,083.33 per month. Federal Registrar, Vol. 69, No. 30, Feb. 2004, pp. 7336–7338.

8. This figure does not include attorneys fees, student loan payments and insurance premiums to Progressive because they are not ongoing expenses of the Debtor and his wife.

for excessive expenses, the reasonable expenses of the Debtor and his wife average $2871.80 monthly. According to the Debtor's expense chart, this amount has been has been further reduced in the past three months because the Debtor and his wife have eliminated recreational expenses and church contributions. *See* Plaintiff's Exhibit 10. Even with these reductions, the Debtor's expenses still exceed his income by approximately $1600. Of the $2,871.80 monthly budget, $900.72 goes to the Debtor's first mortgage, and approximately $461.50 goes to the Debtor's second mortgage. *Id.* The Defendants contend that the Debtor could minimize his housing costs if he downsized and moved into an apartment. The Defendants also argue that there is $10,000 of equity in the Debtor's home that could be used to repay a portion of the PLUS loans. The Defendants offered no evidence in support of their conclusory statements. In fact, the Defendants did not present any case-in-chief to meet their corresponding burden once the Debtor proffered evidence to support his contentions. The Defendants simply tendered their exhibits and rested.

The Defendants also argue that the Debtor should liquidate his IRA accounts, valued at $130,000, and use the funds to pay towards his PLUS loans. For several reasons, this is not an appropriate or effective solution. First, if the Debtor cashes out his IRA, he and his wife may have insufficient retirement income. The Debtor's financial planner, Jeff Zemito, testified that with the Debtor's current IRA, his LTV pension, the Debtor and his wife's combined Social Security Income, the Debtor's PERS, and his wife's SERS payments, the Debtor's combined net retirement income will be approximately $1700 per month in the year 2012.[9] *Zemito*, Direct. *See also* Plaintiff's Exhibit 3–5. While the Defendants challenged some of the assumptions Mr. Zemito made in making this calculation, such as a retirement age of 60 and a 4.00% inflation rate, the Defendant creditors proffered no evidence to refute the calculations and offered no evidence on how the figures would change with different assumptions. It is unrefuted that the Debtor is 53 years old, has a high school education and because of these factors the Debtor has a limited amount of time to replenish his retirement savings. As it currently stands he will receive $1700 in retirement income. This amount, while more than the Debtor's current income, is still not sufficient to cover the Debtor's present monthly expenses. These expenses are unlikely to change substantially in the future given the fact that the Debtor refinanced his home in the year 2000. To take away this source of the Debtor's income may result in a mere shifting of the burden on the taxpayers from the national level, by discharging the government guaranteed-student loan, to the local level if there are insufficient funds at retirement that would necessitate that the Debtor resort to welfare. *See In re Peel*, 240 B.R. 387, 392–393 (Bankr.N.D.Cal.1999).

Second, the IRA funds are insufficient to fully repay the Debtor's PLUS loan obligations. Mr. Zemito testified that if the Debtor cashed out his IRA prematurely, he would incur a back-end sales charge of $10,500, a 10% penalty, and significant tax liabilities.[10] *Zemito*, Direct. This testimony was unrefuted by any authority to the contrary. This does not appear to be a

---

9. This figure increasing as time passes and more funds are withdrawn from the Debtor's IRA accounts and social security payments increase. *See* Plaintiff's Exhibit 3–5.

10. The exact nature of the tax penalty was not ascertained because the witness, Mr. Zemito, was not qualified to testify as a tax expert.

prudent use of the IRA funds, otherwise devoted for retirement purposes.

Lastly, the IRA is exempt property under Ohio state law as long as the funds are necessary to support the Debtor and his' wife in their retirement years. Ohio Revised Code 2329.66(A)(10)(b); 11 U.S.C. § 522(d)(10)(e). None of the Defendants challenged the exempt nature of the IRA, nor did the Chapter 7 Trustee. Indeed, on August 27, 2003 the Debtor's case was declared a no-asset case.

The more appropriate examination of the IRA is to consider this asset as part of the "additional circumstances" assessment of the second prong of *Brunner*. Specifically, whether the Debtor's current financial situation is likely to continue into the future. The IRA and the income that it will begin generating in 2011 will be considered in that fashion. *See* Plaintiff's Exhibit 3–5.

The second prong of *Brunner* as used in *Cheesman*, requires that the Court determine if any additional circumstances exist that indicate whether the Debtor's current state of affairs is likely to persist for a significant portion of the repayment period. *In re Cheesman*, 25 F.3d at 359. There are several factors that suggest that the Debtor's financial situation is likely to improve. First, it should be noted that the Debtor does not suffer from any physical, mental or emotional disability that would prevent him from obtaining employment. *Debtor*, Judge's Inquiry. The Debtor's own employment history and testimony indicates that he will be able to find employment in the near future. Approximately one year after his lay-off from LTV, the Debtor obtained employment at a company called Lawn Tech. He worked at Lawn Tech from March 2003 until August 2003, at which time he was terminated. At this job, the Debtor grossed $1,000 per week. Additionally, the Debtor testified that he

hoped to begin seasonal employment working for his brother in approximately two weeks from the time of trial. The Debtor stated that his rate of pay at this job would be $12 an hour. The Debtor was not sure how many hours a week he would work because his brother was in the business of building break walls and this kind of work is seasonal and weather-dependent. The Debtor's age and educational background understandably diminish the employment opportunities available to him. While the Debtor may not be able to achieve the income that he once earned at LTV, the Debtor's employment history demonstrates that the Debtor is not in a hopeless situation. The Debtor testified that in a "best-case" scenario he believed he could earn $35,000 a year. On the other hand, the income of Nancy Votruba is unlikely to change substantially. She has been employed by the Avon Lake School System for fourteen years in the cafeteria. She testified that due to her educational level and experience, she is not qualified to obtain employment in other areas of the school system. She has not sought full-time employment elsewhere because of her history of breast cancer and the insurance benefits that the school provides. She also testified that while she has held a second job in the past, her physical ailments relating to her breast cancer prevent her from working a second job. The Debtor also has his IRA savings which will begin generating income in the year 2011. *See* Plaintiff's Exhibit 3–5. All of these circumstances indicate that the current financial state of the Debtor, which is near poverty level, is unlikely to persist in the future.

Under the third prong of *Brunner*, the Debtor has established that he has made a good faith attempt to repay his student loan obligations. At the time the Debtor incurred the loan debts, he had been work-

ing for LTV and earned income at a level that precluded any other type of financial aid. The Debtor provided evidence that he paid the loans as they came due beginning in 1995. *See* Plaintiff's Exhibit 1. The parties have stipulated that the Debtor has made payments totaling $25,995.51 towards his student loan obligations. The parties also stipulated that the Debtor used forbearance and grace periods with regard to his loans. The Debtor admitted that he requested and received some of these forbearances while he was still employed at LTV because of a decrease in overtime. *Debtor,* Cross Examination. The Debtor's good faith is further demonstrated by the fact that when he became employed at Lawn Tech he once again began to make payments on the loans. *See* Plaintiff's Exhibit 1. The Defendants argue that the Debtor has not exhibited good faith because he has not fully utilized the deferments and consolidation arrangements available to him. No persuasive argument or evidence has been adduced by the Defendants to establish a bad faith filing or other untoward conduct by the Debtor. The Debtor testified that he has not taken advantage of deferments because he believes it will only delay the inevitable. *Debtor,* Direct. As to consolidation, the Debtor testified that due to the amount of his loans, consolidation would allow him to repay the debts over 30 years, however, he determined that he could not afford the consolidation payments. The Debtor testified that the consolidation payments quoted to him ranged between $700 to $1100 per month. *Debtor,* Direct & Judge's Inquiry. The Defendants offered no contrary evidence as to how much would be required for a monthly consolidation payment. The parties stipulated that the Income Contingency Repayment Program is not available to PLUS loan borrowers. For all of the above reasons the Debtor has demonstrated a good faith attempt to repay his obligations.

In making a determination with regard to the dischargeability of these particular debts, the Court is mindful of the fundamental purpose of the Bankruptcy Code which is to give a "honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Local Loan Co. v. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). This is an honest Debtor, who is financially distressed because of a loss of employment that was beyond his control. This Debtor did what any responsible parent could be expected to do. He attempted to give his three children an advanced education by taking out loans to defray their expenses. This is the exact purpose behind the PLUS loan program. *In re Reid,* 39 B.R. 24, 25–26 (Bankr.Tenn. 1984)("The legislative intent in enacting the PLUS program was to encourage parents to bear their expected share of the student's educational costs rather than the student having to bear this burden through student borrowing.")(citing 1980 U.S.Code Cong. & Admin. News p. 3141). Unfortunately, none of the Debtor's children completed their degree requirements. The Debtor's two sons left college before graduating. The Debtor's daughter was forced to leave school, through no fault of her own, when the Debtor's job at LTV was terminated after 32 years of employment.

It is apparent that this Debtor is not attempting to abuse the student loan program. The Debtor has made continuing and sincere efforts to find further employment. He has kept in contact with his contacts in the steel industry, checks the local newspaper for job listings, and has

family members and other contacts inform him of job opportunities.

There are, however, several factors that mitigate against the finding of an undue hardship that would permit a full discharge. First, the Debtor's circumstances are likely to change in the near future. The Debtor's employment history reveals that after he lost his job at LTV he was employed by Lawn Tech within a year. Less than a year after losing his job at Lawn Tech, he will be working for his brother. Second, the Debtor's search for his job has been narrow in scope. He has not used any employment agencies or temporary employment services. Also, the Debtor has not investigated taking on low-wage jobs to help his financial situation. Third, the Debtor's monthly expenses have not been fully minimized. Lastly, the Debtor does have some accumulated assets in the form of IRA accounts that will begin generating income in the future.

There is no question that the Debtor and his dependant wife are oppressed by the PLUS loans and that they will be unable to make a "fresh start" without some form of relief from these obligations. However, the Debtor has failed to fully meet the requirement of the second prong of *Brunner.* For this reason, they are not entitled to a full discharge on the subject obligations.

■ In cases where debtors have not established an entitlement to an undue hardship discharge, the Court can utilize its authority under § 105(a) of the Bankruptcy Code to fashion an equitable remedy that will give the Debtor the kind of relief he needs to obtain the fresh start that filing for bankruptcy entitles him to. *In re Hornsby,* 144 F.3d at 438–440; *In re Fraley,* 247 B.R. 417, 422, 423 (Bankr. N.D.Ohio 2000); *In re Grine,* 254 B.R. 191, 198–200 (Bankr.N.D.Ohio 2000).

The provisions of § 523(a)(8) and the purpose of the Bankruptcy Code are not mutually exclusive. In fact they are congruent. Section 523(a)(8) allows the discharge of a student loan when there is an undue hardship and the Code's goal is to give honest and financially distressed debtors a fresh start.

In *Hornsby,* the Sixth Circuit determined that bankruptcy courts have the power to take action short of a total discharge of a debtor's student loans. The *Hornsby* Court reasoned that the bankruptcy court is a court of equity and it is guided by equitable doctrines and principles. The Sixth Circuit in *Hornsby* recognized that in some student loan discharge cases the facts and circumstances may require intervention short of an all-or-nothing determination of dischargeability. *Hornsby,* 144 F.3d at 439.

■ This is such a case. This Debtor has very substantial PLUS loan debts that threaten his ability to make a fresh start. They account for 51% of his total debt. This Debtor did not receive any educational benefit from the loans, and he is not trying to discharge the debt on the verge of a lucrative career. The Debtor obtained these loans at a time when he was able to afford them and did so to help his children. The Debtor did not file bankruptcy simply to have his student loans discharged. The Debtor's job loss was beyond his control. Because of the Debtor's age and educational background, he will have a more difficult time finding suitable employment. At the time of trial, the Debtor and his wife's income was at the level of poverty and they were unable to meet their monthly obligations as they came due. While the Debtor's situation is likely to improve somewhat in the near future, it is unlikely that the Debtor will ever be able to achieve the earnings that he did as an

LTV employee.[11] The Debtor demonstrated his good faith by timely repaying his student loan obligations during the periods of time when he was employed.

The Debtor has established an undue hardship, that effects him and his dependant wife, to an extent sufficient to warrant a partial discharge. In granting this partial discharge, the Court attempts to balance the Bankruptcy Code's goal of providing the Debtor a fresh start, with the Congress's concomitant goal of preventing abuse of the student loan system. *Cheesman,* 25 F.3d at 361.

\*     \*     \*     \*     \*     \*

Accordingly, judgment is hereby rendered in favor of the Plaintiff–Debtor, in part. The Debtor is to receive a sixty-five percent discharge of his remaining PLUS loan debt on a pro-rata basis. The remaining thirty-five percent is hereby ordered to be nondischargeable. The discharged amount is to be effective as of the date of judgment. Each party is to bear its respective costs.

**IT IS SO ORDERED.**

### *JUDGMENT*

A Memorandum Of Opinion And Order having been rendered by the Court in this matter,

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that judgment is rendered in favor of the Plaintiff–Debtor, in part. The Debtor is to receive a sixty-five percent discharge of his remaining PLUS loan debt on a pro-rata basis. The remaining thirty-five percent is hereby order to be nondischargeable. The discharged amount is to be effective as of

11.  The Debtor testified that his highest annual income at LTV was approximately $80,000.

the date of judgment. Each party is to bear its respective costs.

IT IS SO ORDERED.